Argued February 4, reversed and remanded February 20, 1963

# BOARD OF MEDICAL EXAMINERS *v.* MINTZ
## 378 P. 2d 945

*Arthur G. Higgs,* Assistant Attorney General, Portland, argued the cause for appellant. With him on the briefs was Robert Y. Thornton, Attorney General, Salem.

*Harold Banta,* Baker, argued the cause for respondent. On the brief were Banta, Silven, Horton & Young.

Before MCALLISTER, Chief Justice, and PERRY, O'CONNELL, DENECKE and LUSK, Justices.

O'CONNELL, J.

This is an appeal from a decree of the circuit court of Multnomah county setting aside an order of the Board of Medical Examiners revoking defendant's license to practice medicine in Oregon.

The medical investigator of the Board of Medical Examiners filed with the board a complaint in which

it was alleged that defendant represented to Mrs. Leroy Mills and Mrs. Phyllis Fogel that he would perform abortions upon each of them for fees varying from $15 to $25; that he administered drugs to them for the purpose of performing an abortion, and that this conduct was contrary to the provisions of ORS 677.190 which sets forth the grounds for the revocation of a medical license.[1]

---

[1] "677.190 The board may refuse to grant a license to any applicant who desires to practice medicine and surgery in this state or may suspend or revoke such licenses for any of the following reasons:

"(1) Unprofessional or dishonorable conduct.

"(2) The procuring or aiding or abetting in procuring an abortion unless such is done for the relief of a woman whose health appears in peril because of her pregnant condition after due consultation with another duly licensed medical physician and surgeon who is not an associate or relative of the physician or surgeon and who agrees that an abortion is necessary. The record of this consultation shall be in writing and shall be maintained in the hospital where the consultation occurred or in the offices of all physicians and surgeons involved for a period of at least three years after the date of such abortion.

"(3) The employing of what are popularly known as 'cappers' or 'steerers.'

"(4) Representing to a patient that a manifestly incurable condition of sickness, disease or injury can be permanently cured.

"(5) The obtaining of any fee through fraud or misrepresentation.

"(6) The wilful betraying of a professional secret.

"(7) Conviction of any offense for which the punishment may be incarceration in a state penitentiary or in a federal prison. A copy of the record of conviction, certified to by the clerk of the court entering the conviction, shall be conclusive evidence.

"(8) Habitual or excessive use of intoxicants or drugs.

"(9) Fraud or misrepresentation in applying for or procuring a license to practice in this state, or in connection with applying for or procuring an annual registration.

"(10) Making false or misleading statements regarding his skill or the efficacy or value of his medicine, treatment or remedy in the treatment of any disease or other abnormal condition of the human body or mind.

"(11) Advertising in any manner, either in his own name or under the name of another person, or clinic, or concern, actual or

444

After a hearing the board made written findings of fact which adopted substantially all of the charges contained in the complaint and concluded from these findings that defendant's acts constituted "unprofessional and dishonorable conduct and was and is contrary to the laws of the State of Oregon, particularly § 677.190 (1) Oregon Revised Statutes." The board then entered its order revoking defendant's license.

Defendant then appealed to the circuit court for Multnomah county. The court held that the board's

pretended, in any newspaper, pamphlet, circular, or other written or printed paper or document, professional superiority to or greater skill than that possessed by fellow physicians and surgeons, the restoration of 'lost manhood,' the treatment of private diseases peculiar to men or women, or the advertising or holding himself out to the public in any manner as a specialist in the diseases of the sexual organs or the diseases caused by sexual weakness, self-abuse or excessive indulgence.

"(12) Advertising or holding himself out to treat diseases or other abnormal conditions of the human body by any secret formula, medicine, method, treatment or procedure.

"(13) The use of any advertising in which untruthful, improper, misleading or deceptive statements are made.

"(14) The advertising of any medicines or any means whereby the monthly periods of women can be regulated or the menses re-established if suppressed.

"(15) The impersonation of another licensed practitioner or permitting or allowing any person to use his certificate in the practice of any system or mode of treating the sick or afflicted.

"(16) Aiding or abetting the practice of any of the healing arts by an unlicensed person or persons, or aiding or abetting any person who has a license to practice any of the healing arts to employ any method of diagnosis or treatment not within the scope of his license.

"(17) The use of his name under the designation 'doctor,' or 'Dr.' or 'M.D.' or any similar designation with reference to the commercial exploitation of any goods, wares or merchandise.

"(18) Insanity or mental disease as evidenced by an adjudication or by voluntary commitment to an institution for treatment of a mental disease, or as determined by an examination conducted by three impartial psychiatrists retained by the board.

"(19) Gross carelessness or manifest incapacity in the practice of medicine or surgery."

complaint failed to state sufficient grounds for action in that the representation by a physician that he would commit an abortion upon a patient could not constitute "unprofessional or dishonorable conduct" within the meaning of ORS 677.190 (1) unless the board had previously adopted rules and regulations specifically defining such conduct as unprofessional or dishonorable.[2] The court also found that the evidence was insufficient to sustain the board's findings as there was "no evidence to prove that the treatment of the doctor would tend or that the appellant intended to cause an abortion."[3] The court set aside the board's order revoking defendant's license and ordered the reinstatement of his license. The board appeals.[4]

[2] The court said: "It is the opinion of the Court that the legislature at the time of the amendment of what is now ORS 677.190 realized that there were other matters which should result in disciplinary proceedings other than those specifically stated in ORS 677.190, Subsection (2) through (18) and as a result Subsection (1) was adopted so that within the confines of the definition of unprofessional and dishonorable conduct contained in ORS 677.010, Subsection (L), the Board could establish rules of conduct which would protect the best interests of the public."

[3] ORS 677.210 provides in part that:

"(5) On appeal the court shall be confined to the record certified by the secretary of the board. The court shall consider the record so certified, and may affirm or reverse the order of revocation or suspension entered by the board.

"(6) The court may reverse the order of the board only on any one or all of the following grounds:

"(a) The complaint does not state sufficient grounds for the action of the board.

"(b) There is no legal evidence to support the action of the board.

"(c) The board did not have jurisdiction of the matter or the accused."

[4] ORS 677.210 (8) provides:

"Either the board or the accused may appeal from the decision of the circuit court to the Supreme Court of Oregon, within 30 days of the entering of the decision, in like manner as in civil actions."

■ We find nothing in the medical practice act (chapter 677) or in the history of the legislation which formed it supporting the lower court's conclusion that the legislature intended ORS 677.010 (L) to be inoperative until the board made rules and regulations further defining "unprofessional or dishonorable conduct."[5]

There is authority for the proposition that a prior formulation of specific standards by the administrative agency is necessary where the grounds for suspension or revocation is cast in broad terms. Sometimes this result is predicated upon the violation of a constitutional right to "due process" and sometimes upon the theory that there is an invalid delegation of legislative power.[6] The contrary view has been taken. The leading case on the point is *Matter of Bell v. Board of Regents*, 295 NY 101, 65 NE2d 184, 163 ALR 900 (1946). In that case the state medical practices act specified certain acts of misconduct. It then provided that a license to practice dentistry could be revoked, suspended or annulled upon a showing " 'that the dentist has been otherwise or in any other way guilty of unprofessional conduct.' " (295 NY at p. 105). The court held, with two judges dissenting, that the promulgation of rules specifying the acts which would constitute unprofessional conduct was not a condition precedent to the board's right to revoke a license. The court rejected the licensee's argument

---

[5] ORS 677.010 (L) defines these terms as follows:

" 'Unprofessional or dishonorable conduct' means conduct unbecoming a person licensed to practice medicine or detrimental to the best interest of the public."

[6] E.g., Green v. Blanchard, 138 Ark 137, 211 SW 375, 5 ALR 84 (1919); Hyatt v. Williams, 148 Cal 585, 84 P 41 (1906); Matthews v. Murphy, 23 Ky L Rep 750, 63 SW 785 (1901); Czarra v. Board of Medical Ex-Supervisors, 25 App D C 443 (1905).

that the statute was fatally vague. The court adopted the view expressed in an earlier case that "the standards of conduct generally accepted by practitioners in the State of New York are not so indefinite that they cannot be determined by qualified persons. They are part of the ethics of the profession and 'what is generally called the "ethics" of the profession is but the concensus of expert opinion as to the necessity of such standards.' * * * [Semler v. Oregon State Board of Dental Examiners, 294 US 608, 612, 55 S Ct 570, 572, 79 L Ed 1086]." (295 NY at 110, 65 NE2d at 189).

■ We agree with the view expressed by the court in the *Bell case,* supra, first in regarding the prior promulgation of rules as unnecessary under the circumstances, and secondly in treating "unprofessional conduct" as an adequate standard. We have previously held that the failure to specify in a statute the standards circumscribing administrative actions is not necessarily fatal.[7] It may be advisable for the legislature or the administrative agency to set out specific adjudicatory standards in some instances.[8] But this does not mean that a statute must always set out the precise instances under which it is to be operative. No matter how specific the standard or standards are stated, there is almost always a penumbra which requires the administrative agency to exercise a judgment as to whether the facts before it fall within or outside the legislative design. And delegated power to decide may be in such vague terms that it is im-

[7] Warren v. Marion County, 222 Or 307, 353 P2d 257 (1960). But see, Comment, State Statutes Delegating Legislative Power Need Not Prescribe Standards, 14 Stan L Rev 372 (1962).

[8] Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards (1962).

possible to discern the legislative policy behind the statute.

But the statute here is not that vague. Admittedly, the term "unprofessional conduct" does not have precise contours circumscribing its meaning. The limits between good and bad professional conduct can never be marked off by a definite line of cleavage. And the variety of forms which unprofessional conduct may take makes it infeasible to attempt to specify in a statute or regulation all of the acts which come within the meaning of the term. The fact that it is impossible to catalogue all of the types of professional misconduct is the very reason for setting up the statutory standard in broad terms and delegating to the board the function of evaluating the conduct in each case. The language in *Old Republic Life Insurance Company v. Wikler,* 9 NY2d 524, 215 NYS2d 481, 486-87, 175 NE2d 147, 151 (1961) is appropriate:

> "* * * In view of the need for practicality and flexibility in laying down standards in areas involving administrative detail and complexity (see, e.g., City of Utica v. Water Pollution Control Bd., 5 N.Y.2d 164, 169, 182 N.Y.S.2d 584, 587, 156 N.E.2d 301, 304), it may not be said that the present standards are either so vague or otherwise inadequate as to amount to an unconstitutional delegation of legislative power."

■ The board's discretion is not without controls. As was noted above, the standards are those which are accepted by the practitioners in the community. The standard must be ascertained through expert opinion; except where the standard is clear as it is in the present case. The act of procuring an abortion contrary to the provisions of ORS 677.190 (2) is clearly unpro-

fessional conduct.⁹ The charge against defendant is that he "did administer * * * drugs or substances * * * for the purpose of performing an abortion * * *." The lower court held that this did not charge defendant with the act of procuring an abortion but only with a mere offer or attempt to commit an abortion. Conceding that the charge is so limited, we are of the opinion that the conduct described is of such a nature that the board was warranted in regarding it as a violation of medical ethics and that it was not necessary to elicit expert opinion outside of the board to support the conclusion.

5, 6. The lower court further held that there was no legal evidence to support the action of the board. As noted earlier, ORS 677.210 (6) (b) provides that the court may reverse the order of the board if "There is no legal evidence to support the action of the board." We construe the term "legal evidence" to mean substantial evidence in this context.¹⁰ Such evidence appears in the record. It is undisputed that Mrs. Mills and Mrs. Fogel made calls to defendant's office for medical consultation and treatment. Each came for two separate series of treatments. Both women testified that at the time of these visits they were pregnant and that the purpose of seeking defendant's services was to induce a miscarriage. At least one of these pregnancies was confirmed by an independent physician. Both testified that defendant agreed to give them shots for the purpose of inducing a miscarriage. Mrs. Mills testified that in administering

⑨ The proscription against performing abortions has been a part of the code of medical ethics from the earliest times. The Hippocratic Oath calls for the following pledge: "Similarly I will not give a pessary to a woman to cause abortion."

⑩ Cf., Latham v. State Unemp. Comp. Com., 167 Or 371, 117 P2d 971 (1941).

the shot defendant used substances from two containers, one a bottle and the other a capsule. According to her testimony, defendant in each instance threw the bottle in the wastebasket but put the capsule in his pocket. Defendant testified that the drug administered was prostigmin and that it was given simply as a test for pregnancy. Prostigmin is a clear white substance, yet Mrs. Mills testified that the contents of the capsule were yellow, a color closer to that of ergot than prostigmin. The prosecution contends that the purpose of administering the drugs was to induce a miscarriage. The evidence indicated that if in addition to prostigmin the drug ergot were also administered the combination of the the two drugs could induce a miscarriage. Although there was testimony that the quantity of ergot necessary to abort would be a dose lethal to the mother in many cases, a pathologist testified that the combination would produce the type of symptoms experienced by these women such as excessive saliva, flushed face, bulging eyes, expanding and tingling ribs and stomach sickness. He also said that the symptoms produced by the combination might last for as long as the women said their symptoms lasted. But he stated that he had never heard of a case in which the symptoms produced by prostigmin alone persisted so long. However, he admitted that the effects produced by prostigmin alone would be similar to the effects produced by a combination of prostigmin and ergot. Mrs. Mills testified that after she received one series of treatments she passed an object or substances which resembled "an oversized bloodclot." Other testimony developed the idea that this substance could have been either a foetus or placenta following a previous birth.

Both women testified in detail as to their conversa-

tions with defendant, the effect which the drugs had upon them, and other matters surrounding the occasions when they received the treatment in question. Defendant denied that he agreed to perform abortions on Mrs. Mills and Mrs. Fogel or that he gave them drugs to induce miscarriages. If either Mrs. Mills or Mrs. Fogel were telling the truth, there would be sufficient evidence to sustain the charge. If their testimony is accepted as true, defendant undertook to induce and did induce a miscarriage under circumstances not sanctioned under the statute. It is true that a finding that defendant was guilty of the acts charged rests primarily upon the credibility of Mrs. Mills and Mrs. Fogel. But the board had the right to believe these witnesses and if the board did, there was evidence to sustain the charges.

The decree of the lower court is reversed and the cause is remanded with directions to reinstate the board's order revoking defendant's license.