Argued July 15, affirmed in part; reversed and remanded in part
August 26, reconsideration denied October 2, petition for
review denied November 13, 1974

# PALEN, *Petitioner, v.* OREGON STATE BOARD
# OF HIGHER EDUCATION, *Respondent.*

### 525 P2d 1047

443

*Warren A. McMinimee,* Tillamook, argued the cause for petitioner. With him on the brief were McMinimee & Kaufman, Tillamook.

*W. Michael Gillette,* Solicitor General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Clarence R. Kruger, Assistant Attorney General, Salem.

Before SCHWAB, Chief Judge, and LANGTRY and TANZER, Judges.

SCHWAB, C. J.

Petitioner seeks review of a decision of the State Board of Higher Education (Board) terminating her employment "for cause." The principal questions presented are whether the Board's regulation defining "cause" to discharge an employe is sufficiently precise and whether substantial evidence supports the Board's decision.

Petitioner was employed by the Board through one of its subordinate institutions, Oregon State University (OSU), as a County Extension Agent in Tillamook County. She had indefinite tenure, meaning under the Board's regulations that she could only be discharged for cause. On April 20, 1972, OSU officials charged petitioner with acts and omissions they contended constituted cause for dismissal. In accordance with the Board's regulation, a hearing was held on these charges before a five-member OSU faculty committee. The committee concluded some charges were proven, others were not proven, and that the proven charges constituted cause for dismissal. Petitioner appealed to the President of OSU. He affirmed the faculty committee's findings and conclusion. Petitioner appealed to the Board. It affirmed the OSU President. This appeal followed.

I

While it would undoubtedly be more orderly to completely separate the question whether the controlling regulation is valid from the question whether it was properly applied to the facts of this case, the questions

cannot be easily bifurcated. The basis for our decision can be best illuminated by first generally discussing the regulation, and then in part II, infra, more specifically discussing it in light of the facts at bar.

Petitioner's discharge was based on Oregon Administrative Rules (OAR) 41.330 (3), which provides:

" 'Cause' shall mean * * * (3) failure to perform the responsibilities of an academic staff member, arising out of his particular assignment, toward his students, toward his academic discipline, toward his colleagues, or toward the institution in its primary educational and scholarly functions * * *."

Much of petitioner's attack on this regulation is based on *Sun Ray Dairy v. OLCC,* 16 Or App 63, 517 P2d 289 (1973). However, *Sun Ray Dairy* is generally inapplicable. That was a case in which an administrative agency had no regulations defining the standards controlling the grant or denial of licenses. Here the Board does have a regulation, OAR 41.330 (3), defining cause for dismissal of an employe. The real thrust of petitioner's attack is that this regulation is so imprecise as to be void for vagueness.

■ "The root of the vagueness doctrine is a rough idea of fairness." *Colten v. Kentucky,* 407 US 104, 110, 92 S Ct 1953, 32 L Ed 2d 584 (1972). The ultimate criterion being fairness, the degree of precision required in statutes and regulations varies somewhat depending upon the context. At one end of the spectrum —where the greatest degree of precision is required— are statutes defining crimes. *See, State v. Hodges,* 254 Or 21, 457 P2d 491 (1969); *City of Portland v. White,* 9 Or App 239, 495 P2d 778, Sup Ct *review denied* (1972). Toward the other end of the spectrum are, for example, statutes defining the relationship

between a governmental employer and its employes—statutes that typically articulate a common standard applicable to myriad different employes performing widely disparate tasks.

Thus, the United States Supreme Court has upheld broadly worded statutory standards in the context of public employment. *Arnett v. Kennedy,* — US ——, 94 S Ct 1633, 40 L Ed 2d 15 (1974), and *CSC v. Letter Carriers,* 413 US 548, 93 S Ct 2880, 37 L Ed 2d 796 (1973), are the leading examples. In *Arnett* the court upheld 5 USC § 7501 which provides that federal civil service employes could be discharged "only for such cause as will promote the efficiency of the service." In *Letter Carriers* the court upheld the Hatch Act prohibition against certain federal employes taking "an active part in political management or in political campaigns." 5 USC § 7324 (a)(2). *See also, Broadrick v. Oklahoma,* 413 US 601, 93 S Ct 2908, 37 L Ed 2d 830 (1973).

■ Against this background, we turn to the controlling regulation, OAR 41.330 (3). It provides, paraphrasing, that cause for dismissal includes the failure of an employe to perform his responsibilities adequately. Based on the analysis in *Arnett* and *Letter Carriers,* we conclude this standard is sufficiently precise in the context of employer-employe relationships, and is not void for vagueness on its face. "There are limitations in the English language with respect to being both specific and manageably brief * * *." *Letter Carriers,* 413 US at 578-79. "We do not believe that * * * [the Board] was confined to the choice of enacting a detailed code of employee conduct, or else granting no job protection at all." *Arnett,* 40 L Ed 2d at 36.

██ Petitioner resists this conclusion by centering her attack on the fact that the Board has no regulations specifying what her responsibilities as a county extension agent were. We are not persuaded that this makes OAR 41.330 (3) void for vagueness. First, evidence can be introduced in individual cases, for example, by way of a job description, to establish the specific responsibilities of a Board employe; standards set out in previously adopted regulations are not essential. *See, Board of Medical Examiners v. Mintz,* 233 Or 441, 378 P2d 945 (1963); *Ward v. Ore. State Bd. of Nursing,* 266 Or 128, 510 P2d 554 (1973). Second, the general responsibilities of all employes in both the public and private sectors are a matter of both common law and common sense; for example, faithfully complying with the employer's direction and control, diligently performing assigned tasks, not doing things obviously inimical to the employer's interests, etc. We conclude that while establishing an employe's specific and general responsibilities may conceivably present problems in the application of OAR 41.330 (3) in some marginal cases, *see,* part II, infra, this problem does not render the regulation void on its face.

██ Another issue seems to be involved in petitioner's argument. Applied literally, OAR 41.330 (3) might make *any* failure to perform *any* responsibility cause for dismissal; for example, cause to dismiss an employe who is late to work one morning after arriving punctually every day for 10 years. Neither the OSU faculty hearing committee, nor the OSU President, nor the Board, so interpreted OAR 41.330 (3) in this case; nor do we. Instead, it is apparent that the intent behind OAR 41.330 (3) was to make dismissal of permanently tenured employes dependent upon estab-

lishing some serious and unreasonable failure to perform responsibilities, or clearly inadequate performance of responsibilities. We so interpret OAR 41.330 (3).

*Stevenson v. Morgan*, 17 Or App 428, 522 P2d 1204 (1974), illustrates our point. The question in that case was what constitutes "good cause" within the meaning of ORS 657.176 (2), which bars unemployment compensation claims when an employe leaves work "voluntarily * * * without good cause." We stated:

> " 'Good cause' may be said to be such cause as would similarly affect persons of reasonable and normal sensitivity * * * and is limited to those instances where the unemployment is caused by external pressures so compelling that a reasonably prudent person, exercising ordinary common sense and prudence, would be justified in quitting work under similar circumstances. [Citing cases.] Thus, the applicable standards to determine 'good cause' are standards of reasonableness as applied to the average man or woman, not the super-sensitive person * * *. The question of 'good cause' is therefore to be determined from the particular circumstances of each case * * *." 99 Adv Sh at 201-202.

Factually, this case is the converse of *Stevenson*; here the question is what constitutes good cause for an employer to terminate an employment relationship. But the legal principle is the same as in *Stevenson*; there we asked whether a reasonable employe would quit under the same circumstances; here the inquiry must be whether a reasonable employer would discharge an employe under the same circumstances.

In summary, we hold that under OAR 41.330 (3): (1) the specific responsibilities of a specific employe of the Board can be proven in individual cases; (2) the Board is entitled to take official notice of the

general responsibilities of all its employes; and (3) such failure to perform responsibilities as will be cause for dismissal must be a substantial deviation from the reasonably expected level of performance. As so interpreted, we hold OAR 41.330 (3) is not void for vagueness.

## II

We turn then to the application of OAR 41.330 (3) to the facts of this case and petitioner's contention that the Board's decision is not supported by substantial evidence.

■ Analytically, application of OAR 41.330 (3) involves three steps. (1) What were the employe's responsibilities? (2) Are the factual conclusions regarding failure to perform responsibilities supported by substantial evidence? (3) If so, do the facts constitute "cause" for dismissal as we have interpreted that term in part I, supra?

As this case comes to us, the Board has determined that four acts and omissions constitute cause for dismissal. Other charges, found to be not proven by the OSU faculty hearing committee, are not before us.

The first of the four reads:

"On December 23, 1971 and on January 4, 1972 Margaret Palen made accusations of improper behavior on the part of Mr. W. G. Nibler, Assistant Director of Agriculture and Community Resource Development, Mr. H. Joe Myers, Assistant Director 4-H and Youth, and Mr. Louis Oester, Coordinator, Training.

"She charged that the above-named gentlemen administered tests which probed into her personal sexual behavior and the type and nature of her undergarments * * *.

"She further stated that Mr. Nibler had made threats to her life and that he had forcibly restrained her when in conference with him. On November 9, 1971, she filed a statement with the Oregon State Patrol accusing Mr. Nibler of threatening her life earlier on that day. Immediate investigation of this allegation revealed Mr. Nibler was in conference in the Linn County Extension Office and had not made contact with her on that day."

There was little dispute in the evidence relevant to this charge. At the hearing, Mr. Kolmer, Director of the Extension Service, testified that in a meeting with petitioner on December 23, 1971, petitioner made all of the accusations set out in the charge. Petitioner also told Mr. Kolmer that once, when she was in Mr. Oester's office, she was aware that a third party, Mr. Nibler, was hiding under Mr. Oester's desk. Petitioner continued, according to Mr. Kolmer, by stating that on the same occasion Mr. Oester and Mr. Myers took Mr. Nibler out of the room and found that Mr. Nibler planned to murder petitioner and her family, and that petitioner would receive a murder threat in the form of a phone call requesting a recipe for quince honey. In the conversation with Mr. Kolmer, petitioner referred to a widely publicized triple murder a few years ago, and implied Mr. Nibler had some connection with it. Petitioner also told Mr. Kolmer that Mr. Nibler wanted to marry her even though he (Mr. Nibler) was already married, and so was petitioner.

On January 4, 1972, petitioner repeated these accusations against Messrs. Nibler, Myers and Oester during another conference with Mr. Kolmer, which was attended by at least one other OSU official. A few months later petitioner also sent letters to Mr. Kolmer and the OSU President alleging "the murder episode" had been "admitted" by Mr. Nibler.

Officer Clarkson testified that petitioner came running into the state police office in Salem on November 9, 1971, with the story that she was about to be murdered. Petitioner explained to Officer Clarkson that she had received a phone call at her office in Tillamook that morning requesting a recipe for quince honey; that this phone call was from Mr. Nibler; and that it constituted a threat to murder her. When Officer Clarkson asked petitioner why she came to the police in Salem instead of in Tillamook, petitioner stated there was a conspiracy in Tillamook against her.

Messrs. Nibler, Myers and Oester each testified that he never threatened or conspired to murder petitioner or her family; never administered tests to petitioner about her sexual behavior, personal habits, or undergarments; never hid under desks or other furniture; and had never done anything to give petitioner reason to believe that he wanted to marry her.

When petitioner testified at the hearing, she did not deny that she had made the various accusations discussed above, conceded that her accusations about tests probing sexual matters and undergarments were not true, and, in response to questions about whether anybody had threatened to murder her, would only say that Mr. Nibler threatened "to get" her.

■ The hearing committee concluded that petitioner had repeatedly made bizarre accusations of serious misconduct against Messrs. Nibler, Myers and Oester, and that none of the accusations were true. As the above summary of the evidence makes obvious, there was substantial evidence to support these factual conclusions within the meaning of ORS 183.480 (7)(d). *See, Von Weidlein/N.W. Bottling v. OLCC,* 16 Or App 81, 514 P2d 560, 515 P2d 936, 517 P2d 295 (1973).

Do the factual conclusions of the hearing committee constitute "cause" to terminate petitioner's employment? As in *Stevenson v. Morgan,* supra, this appears to be "a mixed question of law and fact." 99 Adv Sh at 201.

We believe the hearing committee, OSU President and Board could properly conclude that petitioner's conduct constituted cause for termination. The hearing committee expressed the feeling that petitioner's

" * * * unsupported accusations of improper and possibly criminal conduct on the part of University administrators are of grave concern. The accusations are of a very serious and defamatory nature. At the very least, they serve to disrupt the University in its primary educational and scholarly functions and reflect conduct lacking in professional ethics."

This was not a single isolated event. Petitioner began making unfounded accusations in November 1971 with her "death threat" report to the state police. It was undoubtedly both time-consuming and embarrassing for petitioner's supervisors to have to answer inquiries from the police at that time. Petitioner continued making the same unfounded accusations orally and in writing over the following months, repeating them finally in a letter the President of OSU received on April 5, 1972.

The hearing committee implicitly determined that it was a responsibility of petitioner's employment that she not engage in unwarranted conduct deterimental to the University. The committee explicitly determined that petitioner's proven course of conduct was detrimental to the University. Applying the reasonableness standard stated in part I, supra, we conclude that these

determinations support the further conclusion that cause for discharge was proven.

The second charge proven to the hearing committee's satisfaction read:

" * * * [Petitioner] is unwilling to cooperate with 4-H and Youth staff and has expressed unwillingness to cooperate with the volunteer youth leaders in the county."

Although imprecisely worded, this was treated as a charge that petitioner failed to adequately perform her responsibilities to the Tillamook County 4-H program.

The evidence relating to this charge must be considered in perspective. The Extension Service had assigned petitioner primary responsibility for the adult home economics program and secondary responsibility for the home economics aspects of the county 4-H program. Petitioner testified without contradiction that this meant only she was expected to devote about 20 percent of her time to the 4-H program.

To further put the evidence in perspective, it should be noted that the original charges against petitioner, in addition to the inadequate 4-H program allegation, also charged that petitioner had not adequately performed her primary responsibilities in connection with the adult home economics program. The hearing committee found that petitioner "had been conducting a generally satisfactory Family Living Extension program which met the requirements of the citizens of Tillamook County" but that she "had not cooperated properly with the 4-H and Youth staff."

Three women who participate in Tillamook County Extension programs testified for the University. Much

of their testimony was critical of petitioner's performance in the adult home economics program, performance which the committee found was "generally satisfactory." We have attempted to isolate the parts of their testimony that relate only to petitioner's connections with the 4-H program. Two of the witnesses complained about mistakes that petitioner had made in announcing the winners in 4-H contests at the county fair, although from the record we have difficulty understanding exactly what these mistakes supposedly were. The third witness reported that once, during a conversation connected with 4-H activities, petitioner abruptly turned her back and walked away.

In support of its conclusion that petitioner failed to adequately discharge her responsibilities to the 4-H program, the hearing committee also cited "the testimony of Mr. Dale Freidemann" and 20 exhibits. Mr. Freidemann was the Tillamook County Extension agent whose primary responsibility was the 4-H program. He testified in general terms about complaints he had received from the community about petitioner's 4-H work. To the limited extent that he was at all specific, it appears that the complaints were from the same women whose testimony is summarized above. The only relevant exhibits are letters of complaint written by Mr. Friedemann and the women who testified against petitioner. As we read them, these letters add nothing to the live testimony from the same people.

There was also evidence favorable to petitioner. Dozens of Tillamook County citizens active in all aspects of the extension program either testified for petitioner in person or wrote letters supporting petitioner that were received by the committee as exhibits. All these citizens had found petitioner's performance

on the job to be at least adequate; many of them thought petitioner's performance was excellent. The hearing committee cited this evidence in support of its conclusion that petitioner's work in the adult home economics program had been "generally satisfactory."

■ In summary, this aspect of the case against petitioner ultimately rests on the testimony of the three women who testified against petitioner. That testimony was in effect repeated when Mr. Freidemann testified and when the letters of complaint were received as exhibits, but the repetition does not add anything to the case against petitioner. The testimony of those three women boils down to this: during her five years as an extension agent working in Tillamook County, petitioner made a few mistakes in announcing contest winners at the county fair, and once was extremely rude.

We hold this record does not establish cause for dismissal. As developed more fully in part I, supra, "cause" is limited to job performance so inadequate as to justify a reasonable employer in severing relationships with an employe. Here we have an employe doing substantially the same work—home economics—with an adult clientele about 80 percent of the time and with a younger clientele, 4-H participants, about 20 percent of the time. The OSU faculty hearing committee made the factual determination that her work with adult groups was "generally satisfactory." To be balanced against that, there is proof of two mistakes and one incident of rudeness in connection with 4-H work. While infrequent mistakes and any rudeness may well merit some sanctions, we conclude that the misfeasances revealed by this record would not justify a reasonable employer in discharging petitioner under these circumstances.

The third charge proven to the satisfaction of the hearing committee reads:

"The OSU Extension Service requires that an agent reside in the county or in close proximity to where he or she is employed. Sometime during the summer or early fall of 1970 she [petitioner] moved from Tillamook County to Salem without the concurrence of her County Chairman or District Supervisor. Since then she has repeatedly expressed her unwillingness to reside in Tillamook County. This is contrary to policy and is detrimental to the quality and quantity of program effort in Tillamook County."

■ As noted above, the charges against petitioner were brought under OAR 41.330 (3) which defines cause for discharge as including an employe's failure to perform his responsibilities adequately. As also noted above, it is incumbent upon the Board to prove any *specific* responsibility it claims an employe has failed to perform. The hearing committee concluded that there was sufficient proof that one of the responsibilities of petitioner's employment was living in Tillamook County:

"The Committee finds that while the Extension Service did not present evidence of the existence of a formal written policy regarding the place of residence and employment of County Extension Agents, the Extension Service had presented ample evidence that Mrs. Palen had been informed of the desirability and necessity of living near her place of employment. The distance from Mrs. Palen's residence in Salem to her place of employment at the Extension office in Tillamook is about 75 miles, much of which is narrow, winding, and mountainous road * * *."

We hold the committee erred in this regard.

The issue is not whether the distance petitioner

commuted interfered with her performance of her duties. Another charge made against petitioner stated: "Since she has moved from Tillamook County she has been generally unavailable for evening and weekend meetings and events." Petitioner testified that she would often stay overnight in Tillamook when her work required attending evening or weekend meetings. Apparently believing this testimony, the hearing committee concluded this charge was not proven. Thus, the issue is solely whether it was proven to be one of petitioner's responsibilities to reside in Tillamook County.

Petitioner was living in Hillsboro in 1966 when she was offered the job as a Tillamook County Extension Agent. There was no evidence that anything was said to her at that time about being expected to live in Tillamook County. Petitioner did, however, move to Tillamook County about the time she began working there. In 1971 petitioner's husband was transferred from his job in Tillamook to a job in Salem. Petitioner's immediate supervisor at that time was Mr. Howard Smith. He testified that petitioner inquired about being transferred to an extension office in the Willamette Valley and, when that proved to be impossible, then inquired whether there was any Extension Service rule against her commuting from Salem. Mr. Smith testified that he recommended, as personal advice, that petitioner not attempt to commute such a distance, but in answer to her specific question, told her he knew of no rule against it.

Petitioner also discussed the possibilities of transferring versus commuting with two other supervisors, Mr. Myers and Mr. Oester. Mr. Myers testified he told petitioner it would be contrary to policy to commute from Salem to Tillamook. Mr. Oester testified he told

petitioner he would not approve her commuting that distance, although he never explained why his approval or lack thereof was of any significance. Clearly Mr. Myers and Mr. Oester thought residing in Salem and working in Tillamook was unwise; however, their testimony does not constitute proof that their personal feelings amounted to a responsibility of every extension agent in this state.

More to the point was a pamphlet introduced as an exhibit and the testimony of Mr. Kolmer, Director of the Extension Service. The pamphlet, which is a general description of the history, organization, etc., of the Extension Service, states at one point:

> "Education is the basic job of county Extension agents. As educators, they represent Oregon State University and the United States Department of Agriculture. Agents live in the counties and are in daily contact with rural people as well as with those living in urban areas * * *."

Yet, ironically, the co-author of this pamphlet was Mr. Howard Smith, the same person who, as petitioner's immediate supervisor, told her in 1971 he knew of no rule that would forbid her moving to Salem and continuing to work in Tillamook. Mr. Kolmer described the responsibility of an extension agent about place of residence as being a "common sense policy" meaning "we like to have agents reside in the county" where they work, but there "are some exceptions" such as "when counties are close together." When asked how an extension agent could learn of the existence of such a responsibility, Mr. Kolmer invoked "the philosophy and history of the Extension Service."

█ We hold this does not establish that petitioner was required to live in the county where she worked.

There is no evidence she was ever told before these proceedings began that there was such a requirement by virtue of established organizational policy, as distinguished from the personal feelings of some, but not all, of her supervisors. Her immediate supervisor told her when she planned to move to Salem there was no such requirement. After petitioner moved, she commuted for several months before any objections were raised. In regard to the authors' views expressed in the above-described pamphlet and the testimony of Mr. Kolmer about "the philosophy and history of the Extension Service," we are reminded of one of our observations in *Sun Ray Dairy*:

> " * * * Those policies, the testimony indicates, are informal and unwritten, drawn by the witnesses from their understanding of historical patterns of individual commission rulings. As such, they have the quality of folklore in that unwritten rules are passed on orally by culture carriers from one generation of employes to another, from one level of employes to another, without the stabilizing effect of the written word." 16 Or App at 70.

We do not mean that the specific responsibilities of a Board employe can only be proven by way of written words; we do mean that in the absence of written standards, something more is needed than contained in this record.

Moreover, a certain anomaly would be created if we held that the Board had proven that extension agents must live in the county where they work. There are several references in the record to the distance from one end of Tillamook County to the other being 60 miles. This means, according to the Board's position, that it would be possible for an employe's home to be up to 60 miles from his office, but unacceptable for an

employe's home to be just a few miles from his office if there happened to be a county line between the two. Such a rule would have the virtue of helping the Board win this one lawsuit, but we cannot perceive any other virtues it would have.

The final charge provides:

"* * * [Petitioner] has repeatedly refused to respond to directions from her County Chairman and when requested to provide a schedule of her activities has indicated that she was on a special assignment and was not required to report to the County Chairman.

"This is not a true statement in that the Extension Administration has not placed her on special assignment and her refusal to respond to the directives of the County Chairman, in the same fashion as is required of other staff, is insubordinate behavior detrimental to the program and morale of the Extension Service."

Mr. Massie was the county chairman of the Extension Service office in Tillamook County, meaning he was the highest-ranking Extension Service employe in the county and in over-all charge of the office. He testified that he required the extension agents in the office to submit schedules of their planned activities for the week every Monday. He indicated that he first conveyed this requirement to petitioner orally, but that she complied only erratically. He then stated the requirement in a written memorandum, but petitioner's compliance did not improve.

The office secretary, to whom the extension agents submitted their schedules on Monday, corroborated Mr. Massie's testimony.

Petitioner testified that she had never failed to submit the required weekly schedule or to comply with

Mr. Massie's other requirements. The hearing committee chose to believe Mr. Massie and disbelieve petitioner, finding that petitioner "had repeatedly refused to respond to directions from her County Chairman." There was substantial evidence to support this factual finding. *Von Weidlein/N.W. Bottling v. OLCC,* supra.

It belabors the obvious to note that the hearing committee was entitled to conclude that by the very definition of the employer-employe relationship it is a general responsibility of every employe to comply with the employer's direction and control.

■ Given the existence of this responsibility and substantial evidence supporting the factual conclusions that petitioner failed to perform it, does this constitute "cause" for dismissal? The test is whether a reasonable employer would so regard it. *See,* part I, supra. In applying this test, the Board is entitled to operate within a zone of reasoned discretion. The Board is, after all, in a better position than we are to evaluate how detrimental petitioner's insubordination was to the program and morale of the Extension Service. If the Board were to regard this insubordination as cause for petitioner's termination, we cannot say such a conclusion would be an abuse of the Board's limited discretion.

In conclusion, we hold: (1) as to the first and last charges discussed above, there is sufficient proof concerning petitioner's responsibilities and failure to perform them; (2) the facts relating to the charge about insufficient performance of 4-H work, even viewed in the light most favorable to the Board, do not constitute cause for dismissal; and (3) the charge of failure to reside in Tillamook County cannot be

sustained because it was not proven to be one of petitioner's responsibilities to do so.

■ The Board concluded that all four charges against petitioner amounted to cause for dismissal. In analogous license-revocation cases, when we affirm some charges and reverse other charges, we then remand to the agency to reconsider its action in light of our decision. For example, *LaMar's Enterprises, Inc. v. OLCC,* 18 Or App 77, 524 P2d 336 (1974); *Palm Gardens, Inc. v. OLCC,* 15 Or App 20, 514 P2d 888 (1973), Sup Ct *review denied* (1974). We adopt that disposition here.

As noted above, on remand the Board is entitled, but not required, to conclude that the two charges against petitioner we affirm constitute cause for dismissal within the meaning of OAR 41.330(3). That is a question for the Board.

Affirmed in part; reversed and remanded in part.