Argued April 23, affirmed June 21, reconsideration denied July 21, petition
for review denied September 1, 1976

CORCORAN, *Petitioner,*

*v.*

# BOARD OF EXAMINERS FOR SPEECH PATHOLOGY AND AUDIOLOGY, *Respondent.*

(CA 5340)

550 P2d 1391

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

*Joe B. Richards,* Eugene, argued the cause and filed the briefs for petitioner.

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Schwab, Chief Judge, and Langtry and Lee, Judges.

■■■■■■■■■■

LANGTRY, J.

**LANGTRY, J.**

Applicant seeks judicial review of an order of the Board of Examiners for Speech Pathology and Audiology denying his application for licensing as an audiologist.

Enacted in 1973 (Oregon Laws 1973, ch 199), ORS ch 681 prohibits the practice of either audiology[1] or speech pathology[2] by individuals not licensed in accordance with the provisions of ORS 681.250 through 681.340.[3] Essentially two alternative means of securing a required license were provided by the legislature: (1) Under the terms of ORS 681.260 an applicant must meet specific and enumerated academic requirements, practice under the supervision of a licensed or certified audiologist or speech pathologist for a designated period of time, and pass an examination approved by the Board. (2) ORS 681.300(1) provides that the requirements of ORS 681.260 may be waived, and a license granted, to a "qualified [applicant] who, on July 3, 1973, [was] actively engaged in the practice of speech pathology or

---

[1] "'Practice of audiology' means the application of principles, methods, and procedures of measurement, testing, appraisal, prediction, consultation, counseling and instruction related to hearing and hearing impairment for the purpose of modifying communicative disorders involving speech, language, auditory function, including auditory training, speech reading and hearing aid evaluation, or other behavior related to hearing impairment." ORS 681.205(4).

[2] "'Practice of speech pathology' means the application of principles, methods and procedures for the measurement, testing, evaluation, prediction, counseling or instruction related to the development and disorders of speech, voice or language for the purpose of evaluating, preventing, habilitating, rehabilitating or modifying such disorders and conditions in individuals or groups of individuals." ORS 681.205(5).

[3] ORS 681.230 specifically exempts various "classes" of individuals—including speech pathologists or audiologists employed by federal agencies or accredited colleges and universities, and persons licensed in another state—from the licensing requirements of ORS 681.260; the same statute also limits the scope and duration of a "practice" permitted under any of the designated exemptions.

audiology * * * providing * * * [the license application was filed] within one year of July 3, 1973."[4]

On May 1, 1974 applicant submitted to the Board his application for a license as an audiologist, seeking admission under the terms of ORS 681.300(1), the "grandfather clause."[5] A "Notice of Denial of License" forwarded to the applicant on January 9, 1975[6] indicated that his application had been denied for the reason that he:

"1. [Was] not a person[7] who, on July 3, 1973, was actively engaged in the practice of audiology in Oregon.

"2. [Had] not presented written evidence from a licensed or certified audiologist supervisor of nine months of post-educational professional employment pertinent to audiology."

[4] ORS 681.300 also provides that the Board shall waive "the examination" and grant licenses to prospective applicants who

"(2) * * * present proof of a current license in a state which has standards equivalent to those of this state [or]

"(3) * * * hold the Certificate of Clinical Competence of the American Speech and Hearing Association in the area for which they are applying for a license."

[5] See Annotation, 4 ALR2d 662 (1949).

[6] On June 5, 1974 the Board forwarded applicant a letter informing him that "[a]lthough you have shown that you have been actively engaged in the practice of *speech pathology,* the Board finds it necessary to determine those applicants who are 'qualified' under [ORS 681.300(1)], * * *" (emphasis supplied) and requesting that he forward his academic records. Apparently one of many "form letters" mailed to applicants by the Board, the bulk of which were sent to individuals applying for licenses as speech pathologists, the reference to applicant's assertion that he had been actively engaged in the practice of "speech pathology" was apparently an oversight on the part of the Board. On October 31, 1974 applicant was sent notification that his academic preparation was not sufficient to qualify for an audiologist's license under ORS 681.300(1).

[7] At the time of the hearing below counsel for the Board indicated that the word "qualified" had been omitted from before the word "person" in this sentence due to a typographical error; he contended, however, that this error could not serve to remove from the Board's consideration the question of whether applicant was, in fact, "qualified" within the coverage of ORS 681.300(1). Counsel was, nonetheless, willing to agree to allow applicant to meet that question at an additional hearing at a later date if he had been misled in any way by the "erroneous" notice. Applicant's own counsel conceded that he was fully prepared to present evidence on the issue of his client's qualifications but argued that the issue was not properly before the Board. That the incompleteness of the notice resulted in any prejudice to the applicant has not, however, been raised as an issue in this appeal.

Following a hearing on the matter conducted in accordance with applicable provisions of the Administrative Procedures Act (ORS ch 183), the Board issued a final order incorporating the following conclusions:

"Applicant was not a qualified applicant, who on July 3, 1973 was actively engaged in the practice of audiology in Oregon. ORS 681.300(1).

"* * * * *

"ORS 681.300(1) does not use the mandatory 'shall' requiring the Board to issue licenses. The subsection states the board 'may' issue licenses. The Board is entitled and authorized to exercise its discretion in determining whether applicant is 'qualified' and 'practicing' audiology. The Board concludes he is not qualified nor practicing.

"* * * * *

"ORS 681.260(5), requiring an applicant to submit to the Board written evidence from a licensed or certified audiologist supervisor of nine months of full-time post-educational professional employment, does not relate to educational or examination requirements under ORS 681.300(1) and is thus a requirement that cannot be waived by the Board. Applicant did not possess this experience.

"The Board in the past has interpreted ORS 681.260(5) to be not applicable to a person applying for licensure under ORS 681.300(1) but only applicable to persons applying for licensure under ORS 681.260. Since applicant is in fact applying for licensure under ORS 681.300(1), it would be unfair for the Board to attempt to invoke this provision as a basis for denial. As a result, this basis of denial is accordingly withdrawn from consideration by the Board."

In his petition for judicial review of the Board's order of denial applicant designated 11 ostensibly separate grounds for reversal; his brief to this court includes eight assignments of error. In effect, however, applicant has raised but a single question of serious consequence which requires discussion: Was the Board's conclusion that he was not a "qualified applicant * * * actively engaged in the practice

of audiology * * *" as of July 3, 1973 based upon "substantial evidence in the whole record?"[8] The answer to this inquiry adequately meets all of the asserted errors.

Implicit in the arguments advanced by applicant before this court is the contention that as a prerequisite to determining whether he was "qualified and actively engaged in the practice of audiology" the Board was obligated to promulgate rules and/or regulations defining with some specificity both the qualifications necessary and the characteristics or components of an "active" practice. A similar argument was made in *Board of Medical Examiners v. Mintz,* 233 Or 441, 378 P2d 945 (1963), by a physician who had had his license to practice medicine revoked on the ground that he had engaged in "unprofessional or dishonorable conduct." On appeal to the circuit court the physician had obtained an order reinstating his license, having convinced the court that his actions could not be relied upon as a basis for revocation because the Board had not previously adopted rules or regulations specifically characterizing it as prohibited conduct. In reversing the order of the circuit court, the Supreme Court said:

> "We find nothing in the medical practice act * * * or in the history of the legislation which formed it supporting the lower court's conclusion that the legislature intended [the statute authorizing the revocation of a license to practice medicine] to be inoperative until the board made rules and regulations further defining 'unprofessional or dishonorable conduct.'
>
> "* * * * *
>
> "* * * We have previously held that the failure to specify in a statute the standards circumscribing administrative actions is not necessarily fatal. It may be

[8]"The court may affirm, reverse or remand the order [issued in a contested case]. The court shall reverse or remand the order only if it finds:

"* * * * *

"(d) The order is not supported by substantial evidence in the whole record." ORS 183.482(8)(d).

[ 754 ]

advisable for the legislature or the administrative agency to set out specific adjudicatory standards in some instances. But this does not mean that a statute must always set out the precise instances under which it is to be operative. No matter how specific the standard or standards are stated, there is almost always a penumbra which requires the administrative agency to exercise a judgment as to whether the facts before it fall within or outside the legislative design * * *.

"* * * The limits between good and bad professional conduct can never be marked off by a definite line of cleavage. And the variety of forms which unprofessional conduct may take makes it infeasible to attempt to specify in a statute or regulation all of the acts which come within the meaning of the term. The fact that it is impossible to catalogue all of the types of professional misconduct is the very reason for setting up the statutory standard in broad terms and delegating to the board the function of evaluating the conduct in each case * * *.

"The board's discretion is not without controls. * * * [T]he standards are those which are accepted by the practitioners in the community. The standard must be ascertained through expert opinion; except where the standard is clear * * *." (Footnotes omitted.) 233 Or at 446-48.

In a subsequent case involving the revocation of a license to practice nursing based on " '* * * conduct derogatory to the standards of professional nursing,' " this court interpreted the decision of the court in the *Mintz* case to stand for the proposition that:

"* * * [T]he standards of conduct generally accepted by practitioners in the community are an adequate guide for the administrative body. * * * [T]he rationale of *Mintz* is equally applicable to professional nursing. Therefore, we hold that '[c]onduct derogatory to the morals or standards of professional nursing' is an adequate statutory standard, and that prior promulgation or administrative rules was not a condition precedent to proceeding against respondent under the statute.

"A necessary corollary to the need for flexibility in statutory language is recognition of the fact that the Board's discretion is not without controls. The standards

[ 755 ]

which are accepted by the practitioners in the community must be ascertained at the hearing through expert opinion, except in the clearest of cases."[9] *Ward v. Ore. State Bd. of Nursing,* 11 Or App 353, 358-59, 502 P2d 265 (1972), *rev'd on other grounds,* 266 Or 128, 510 P2d 554 (1973).[10]

■ The Board was not, therefore, under any duty to define by rule or regulation either the qualifications or the nature of an "active practice in audiology" necessary as prerequisites to licensing under the terms of ORS 681.300(1).[11] As noted in both *Mintz* and *Ward,* however, the Board's discretion in awarding and denying licenses under the grandfather clause was not without limitation. In the absence of appropriate rules

[9] *See also Klein v. Real Est. Comm. Holbrook,* 19 Or App 646, 658-59, 528 P2d 1355 (1974); *Palen v. State Bd. of Higher Education,* 18 Or App 442, 448, 525 P2d 1047, Sup Ct *review denied* (1974); *Campbell v. Bd. of Medical Exam.,* 16 Or App 381, 393, 518 P2d 1042, Sup Ct *review denied* (1974); *Sch. Dist. No. 48 v. Fair Dis. App. Bd.,* 14 Or App 634, 655, 514 P2d 1114 (1973).

[10] Concluding that the evidence produced at the hearing before the Board had been inadequate to establish "the existence or the nature of standards as to what constitutes the practice of professional nursing * * *," this court had reversed the revocation order. On review the Supreme Court held that "* * * [e]xpert testimony is not needed to establish that aiding and abetting another to hold oneself out as a registered nurse [the misconduct charged] is a violation of the standards of professional nursing * * *." *Ward v. Ore. State Bd. of Nursing,* 11 Or App 353, 362, 502 P2d 265 (1972), *rev'd on other grounds,* 266 Or 129, 131, 510 P2d 554 (1973).

[11] On February 15, 1974 the Board had, in fact, "approved" what were to be adopted as such on or about March 10, 1974. Those rules included the following provisions:

> "1. All applicants who hold the American Speech and Hearing Association's certificate of Clinical Competence in Audiology.
> "* * * * *
> "5. In order to establish that the applicant has been actively engaged in the practice of Speech Pathology or Audiology, written evidence must be presented from a licensed or certified Speech Pathologist or Audiologist indicating nine months of full time, post-educational professional employment pertinent to the license being sought. 'Full time' means at least nine months in a calendar year and a minimum of 30 hours per week. The professional employment must have been since July of 1972."

The anticipated adoption of these rules, however, never occurred; they were, in fact, rescinded as proposals although retained for consideration as "guidelines."

or regulations it was incumbent upon the Board to establish by means of "expert" testimony a standard against which the qualifications and practice of an applicant could be measured.

Included among the findings of fact made by the Board in this case were the following:

"\* \* \* \* \*

"Applicant, on July 3, 1973, was engaged in the retail sale, lease and rental of hearing aids to customers and in conjunction therewith, measured the range of human hearing in order to engage in such practice.

"\* \* \* \* \*

"An audiologist is educated and trained to do far more than measure hearing by use of a simple audiometer for the purpose of selling or renting a hearing aid. This education and training includes being capable of performing audiological diagnostic tests to determine possible lesions under referral from a physician; being capable of recognizing the possibility of such a lesion; being capable of recognizing the possibility of a lesion in performing tests for hearing loss. The audiologist must be capable of engaging in auditory training, speech reading and utilizing the total psychological and social history of the patient to assist in overcoming hearing loss. Applicant did not engage in these activities nor other routine audiological services, such as speech reading, habilitative and rehabilitative services nor was he trained in these areas. Applicant was not engaged in these audiological functions as of July 3, 1973.

"An audiologist must not only be trained to conduct certain audiological tests, but also to use his judgment as to when such tests may be necessary. These tests include use of an impedance audiometer, conducting psychogalvanic skin response testing and other specialized auditory tests.

"The ability to select and perform such tests is beyond the scope of knowledge of hearing aid dealers. Applicant was not performing such tests, nor was he capable of performing these tests as of July 3, 1973.

"\* \* \* \* \*."

■ Based upon applicant's own testimony concerning

[ 757 ]

his qualifications and the nature of his "practice"—characterized by him as a "specialization in amplification"—as of July 3, 1973 and evidence produced by the testimony of four different "experts" appearing on behalf of both the Board and the applicant, these findings indicate, in essence, that while applicant was performing some activities legitimately within the domain of a practice in audiology on that date, the extent of his training in the field prevented him from engaging in the full range of testing, diagnosis, and treatment services which an "audiologist" would be capable of providing. Although the expert testimony offered was both equivocal and somewhat conflicting on some points, we are satisfied that taken as a whole it provided the Board with an adequate standard with which to evaluate applicant's practice as of July 3, 1973. The findings of the Board noted above were, therefore, supported by "substantial evidence"[12] in the record. Those findings were, in turn, an adequate basis for the conclusion that applicant was not a "qualified applicant * * * actively engaged in the practice of audiology" on July 3, 1973.

Affirmed.

---

[12] "* * * [S]uch relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' * * *" *Bay v. State Board of Education,* 233 Or 601, 605, 378 P2d 558, 96 ALR2d 529 (1963), citing *Edison Co. v. Labor Board,* 305 US 197, 59 S Ct 206, 83 L Ed 126 (1938).