**MEDICAL LICENSING BOARD OF INDIANA, Appellant and Cross-Appellee (Defendant Below),**

v.

**Joseph M. WARD, D.C., Appellee and Cross-Appellant (Plaintiff Below).**

**No. 4-282A41.**

Court of Appeals of Indiana, Fourth District.

June 9, 1983.

Rehearing Denied July 22, 1983.

Linley E. Pearson, Atty. Gen., Dan S. LaRue, Deputy Atty. Gen., Indianapolis, for appellant and cross-appellee.

Gregory A. Purvis, Kenneth C. Kern & Associates, Indianapolis, for appellee and cross-appellant.

MILLER, Judge.

The Medical Licensing Board of Indiana seeks the reversal of a trial court's decision which overturned the Board's revocation of Dr. Joseph M. Ward's license to practice chiropractic. The Board concluded Ward had engaged in "willful or wanton misconduct," in violation of Ind.Code 25–22.5–6–2(6) (West 1980),[1] when he massaged the genitalia of several female patients. Upon Ward's petition for judicial review, the trial court reversed the Board's order, most particularly for insufficiency of the Board's findings, and remanded to the Board for further proceedings, including further evidence (if desired by the Board) and specific findings of fact. We reverse the decision of the trial court, reinstate the Board's order revoking Ward's license, and dissolve the trial court's stay order.

## ISSUES

A number of issues are raised for our review by both parties. The Board advocates three issues in urging us to reverse:

1. Certain of the trial court's findings and conclusions of law, primarily alleging the insufficiency of the Board's findings, were contrary to law.

2. Contrary to the trial court's finding, expert testimony is not required to define behavior as "willful or wanton misconduct" in proceedings before the Board.

3. The Board did not commit reversible error when it admitted the complete text of a hearsay document introduced by Ward who claims he offered only a part thereof.

In his cross-appeal, Ward sets forth alternative grounds for affirmance, claiming:

4. He was entitled to reversal for the Board's failure to timely file its Findings of Facts.

5. The Board violated his right to due process by revoking his license on the basis of facts differing from those contained in the statement of charges.

---

1. Ind.Code 25–22.5–6–2 (West 1980) was repealed by 1981 Ind.Acts., P.L. 222, § 296. Comparable provisions are now found at Ind. Code 25–22.5–6–2.1. The entire statute under which Ward was disciplined read as follows:

 "To promote uniformity among the several states and territories and to provide guidelines for physicians and the board, the following charges will be grounds for probation of a licensee or suspension or revocation of a license:
 (1) the use of any false, fraudulent or forged statement or document, or the use of any fraudulent, deceitful, dishonest or immoral practice in connection with any of the licensing or permit requirements;
 (2) the acts from which a felony conviction resulted, if the acts have a direct bearing on whether or not the person should be entrusted to serve the public as a licensed physician;
 (3) currently using or consuming a drug or intoxicant so as to render the licensee unsafe or unfit to practice medicine or osteopathic medicine;
 (4) suffering from a mental or physical disability so as to render the licensee unsafe or unfit to practice medicine or osteopathic medicine;
 (5) except as otherwise permitted by law, to knowingly prescribe, sell or administer any drug classified as a narcotic, addicting or dangerous drug to a habitue or addict;
 (6) *willful or wanton misconduct or manifest incapacity in the practice of medicine or osteopathic medicine;*
 (7) the practice of medicine or osteopathic medicine under a false or assumed name;
 (8) the willful performance of an act likely to deceive or harm the public; or
 (9) the suspension or revocation by another state of a license to practice medicine based upon acts by the licensee similar to acts described in this section. A certified copy of the record of suspension or revocation is conclusive evidence of the other state's suspension or revocation." (Emphasis added.)
 IC 25–22.5–6–2.

Ward further contests the trial court's order of remand to the Board for further proceedings and, in doing so, argues the following additional grounds for affirmance:

6. The trial court improperly remanded the matter to the Board for further proceedings when Ward had presented to the court several grounds for permanently disposing of his case without remand:

(a) The language, "willful or wanton misconduct," found in IC 25–22.5–6–2(6) is unconstitutionally vague.[2]

(b) Ward was denied his due process rights because the Board was not a fair and impartial tribunal for hearing charges against chiropractors.

(c) The Board exceeded its statutory authority by unlawfully attempting to limit the scope of chiropractic beyond the restraints of Ind.Code 25–10–1–8 (West 1980) (repealed 1981 Ind.Acts, P.L. 222, § 296).

7. This appeal by the Board is moot inasmuch as its authority over chiropractors ended on July 1, 1982, with the creation of a board of chiropractic examiners.

## FACTS

In April, 1980, the Board served a notice of hearing and a statement of charges against Ward, alleging willful or wanton misconduct in the practice of medicine in violation of IC 25–22.5–6–2(6) as incorporated by Ind.Code 25–10–1–6 (West 1980) (amended 1981 Ind.Acts, P.L. 222, § 107). The acts underlying the alleged misconduct involved four of Ward's female patients, each of whom claimed Ward had administered to them unjustifiable treatment, without warning, explanation or permission, under the guise of chiropractic, to-wit: massaging with hand or vibrator (in various combinations) the stomach, vagina, groin, buttocks, and/or breasts, of the complaining patients.

The attorney general elicited the following testimony at the hearing from the four female witnesses (the evidence, as written here, paraphrases the testimony but employs some terminology and colloquialisms of each witness):

Brenda _____ testified a friend recommended Ward to her for treatment of a backache. On her arrival, she introduced herself to Ward who was alone in his office. Ward told her to disrobe and furnished her with a gown. As Brenda still wore her underpants, Ward removed them himself and set them on the windowsill. Ward proceeded to manipulate and rub her feet, legs and arms, all the while murmuring that women do not know how to relax anymore. He then instructed her to turn and lie on her back whereupon he drew her gown above her stomach and proceeded to massage her stomach with a hand vibrator. When he put his vibrating hand over her clitoris, she demanded to know what the hell he thought he was doing. He stated he was trying to relax her stomach muscles.

Sharon _____ went to Ward complaining of aching in her lower left back. During the course of treating her spine, Ward slipped his hand under her gown, inserted his fingers under the band of her underpants, and ran his thumb across her vagina. He stopped when she told him he did not need to do that. Additionally, Ward admitted using a vibrator in the groin area. Sharon's son was present in the treatment room but was unaware of Ward's behavior.

Carol _____, suffering from rheumatoid arthritis, went to Ward because her left hip was hurting. Her husband accompanied her, but she was alone with Ward during treatment. The offending conduct occurred when Ward's fingers went into Carol's pants and he ran his hand casually across her vagina for about two seconds. He then pushed his thumb hard into her

---

2. Ward also charged the statute was unconstitutionally overbroad; however, he never argued this point in his brief, and it is waived. Ind.Rules of Procedure, Appellate Rule 8.3(A)(7). *Cf. Cottongim v. Congleton,* (1964)

245 Ind. 387, 199 N.E.2d 96 (constitutional arguments regarding impairment of contracts waived); *Holt v. City of Bloomington,* (1979) Ind.App., 391 N.E.2d 829 (due process argument waived).

groin area and, according to the investigative report read into evidence as part of Ward's case, continued to massage her vagina. As Carol dressed to leave, she discovered a two-inch gash in her groin bleeding profusely.

Rebecca _____, the last complaining witness, was suffering from intense pain in her neck and shoulders when she went to Ward. She took off all her clothes as he instructed her and put on a gown. Her treatment was conducted with a hand vibrator and included massaging both her breasts through her gown. The massage continued down her body until Ward's hand stopped between her legs on her vagina, the vibrator continuing to operate through the gown. Rebecca was alone with Ward throughout this procedure and, because of her small size, experienced a certain amount of apprehension during the treatment.

Dr. David Harp, a licensed chiropractor, was called as an expert witness by the attorney general and testified that, in his professional opinion, there was no justification for a chiropractor licensed in Indiana to touch in any way a female patient's vagina or breasts and that he knew of no chiropractic method of adjusting a patient's spinal column which would require touching the genitalia. Ward claims his case was also damaged when Fred Davis, an investigator for the Board, read aloud part of one of the Board's investigative reports. A portion of Davis's report had been read during Ward's case-in-chief for the purpose of impeaching Brenda. Ward objected, on grounds of hearsay, when the attorney general requested Davis read the *rest* of the report, which part included a statement from another chiropractor that he had the names of 17 other women who had called him with similar complaints about Ward. Thereafter, Ward himself proposed that the whole report be admitted "over my objection." Ward produced several of his other female patients as character witnesses and testified on his own behalf, at times refuting the testimony of the complaining witnesses and at other times agreeing, but in all instances asserting his treatments were

in accordance with chiropractic principles and not sexually motivated.

Ward received the Board's notice of its decision on October 18, 1980, and he petitioned the trial court for judicial review on October 20, 1980. A receipt for certified mail in the record shows Ward evidently received the Board's final order on October 23, 1980, which order unanimously revoked Ward's license and contained the following findings of fact and conclusions of law:

"1) The Respondent, Joseph M. Ward, D.C., holds a valid license to practice Chiropractic, Number 96.

2) The Respondent, Joseph M. Ward, D.C., maintains a chiropractic office at 2206 College Avenue, Terre Haute, Indiana 47803.

3) On August 7, 1979, Respondent, Joseph M. Ward, D.C., treated Brenda [_____] at his office. [Brenda] was complaining of back pain.

4) Respondent's treatment of [Brenda] included the massaging with a mechanical vibrator of her unclothed stomach and genitalia.

5) No justification existed for such a chiropractic treatment.

6) In July, 1978, Respondent, in his said office, treated Sharon [_____] who had complained of pain in her back.

7) Respondent's treatment of [Sharon] included the massaging of her genitalia.

8) No justification existed for such a chiropractic treatment.

9) In August, 1977, Respondent, treated Carol [_____] and during the course of treatment Respondent proceeded to massage her genitalia with his hand and a mechanical vibrator, after [Carol] had complained of pain in her back.

10) No justification existed for such a chiropractic treatment.

11) In April, 1976, Respondent, treated Rebecca [____] and during the course of treatment he proceeded to massage her breasts and genitalia after [Rebecca] had complained of pain in her neck and shoulder.

12) No justification existed for such a chiropractic treatment.

13) At no time did the Respondent inform his aforementioned patients in advance that he would massage the aforesaid areas of their bodies.

## CONCLUSIONS OF LAW

Based upon the preceding Findings of Fact, the Board now makes the following Conclusions of Law:

1) The aforementioned acts of the Respondent, Joseph M. Ward, D.C., constitute 'willful or wanton misconduct' in the practice of chiropractic which willful or wanton misconduct constitutes grounds for probation, suspension, or revocation of Respondent's license, under I.C. 25–22.5–6–2(6) and I.C. 25–10–1–6.

2) Respondent is guilty of 'willful or wanton misconduct' in the practice of chiropractic, under I.C. 25–22.5–6–2(6).

3) The Board had jurisdiction to hear this case."

On review, the trial court reversed the decision of the Board and remanded for further proceedings. Its order included the following findings of fact and conclusions of law:

"[FINDINGS OF FACT]

\* \* \* \* \* \*

10. The Board's Finding of Fact Number 4 is unsupported by sufficient and substantial evidence, in that [Brenda] did not testify that Plaintiff treated her by 'massaging.' Said Finding Of Fact is supported by substantial evidence to the extent that the administrative transcript reveals that Plaintiff made contact with [Brenda's] stomach and external genitalia.

11. The Board's Findings Of Fact, Numbers 5, 8, 10 and 12 are insufficient findings. A finding that a chiropractic practice is (or is not) justifiable does not directly relate to whether 'willful or wanton misconduct' in the practice of chiropractic existed pursuant to I.C. 25–22.5–6–2(6).

12. There is not sufficient and substantial evidence in the record to support any Finding or Conclusion of 'willful or wanton misconduct' in the practice of chiropractic. Such evidence would be in the nature of expert testimony, as such matters are not within the comprehension and knowledge of the average layman. An expert did testify before the Board, but did not give any opinion as to whether the acts of Plaintiff constituted 'willful or wanton misconduct' in the practice of chiropractic.

\* \* \* \* \* \*

14. The Board's Finding Of Fact Number 7 is not supported by sufficient and substantial evidence, in that [Sharon] did not testify that Plaintiff treated her by 'massaging'. Said Finding of Fact is supported by substantial evidence to the extent that the administrative transcript reveals that Plaintiff made contact with [Sharon's] external genitalia.

15. The Board's Finding of Fact Number 9 is not supported by sufficient and substantial evidence in that [Carol] did not testify that Plaintiff treated her by 'massaging'. Said Finding is supported by substantial evidence to the extent that the administrative transcript reveals that Plaintiff made contact with [Carol's] external genitalia.

16. The Board's Finding Of Fact Number 11 is not supported by sufficient and substantial evidence, in that [Rebecca] did not testify that Plaintiff treated her by 'massaging' her genitalia. Said Finding is sufficient and supported by substantial evidence to the extent that [Rebecca] did testify that Plaintiff massaged her breasts, and also to the extent that the administrative transcript reveals that Plaintiff made contact with [Rebecca's] external genitalia.

17. The Board's Finding of Fact Number 13 is supported by substantial evidence. However, said Finding is also insufficient, as it does not necessarily relate to the charge of 'willful or wanton misconduct' in the practice of chiropractic.

\* \* \* \* \* \*

[CONCLUSIONS OF LAW]

1. The Order of the Medical Licensing Board of Indiana revoking the license of Plaintiff to practice chiropractic based upon a charge of 'willful or wanton misconduct' in the practice of chiropractic is unsupported by substantial evidence pursuant to I.C. 4–22–1–14(5);

2. The Findings Of Fact made by the Board were not made with the specificity required by law, and specifically do not conform to the requirements of *Rivera v. Simmons Company* (1973), 157 Ind.App. 10, 298 N.E.2d 477, and *Board of Medical Registration and Examination v. Stidd* (1978), 177 Ind.App. 21, 377 N.E.2d 896.

3. The Board's Findings Of Fact do not necessarily support its Conclusions of 'willful or wanton misconduct.' The Board made findings that certain chiropractic treatments were not justified. That was not the question before the Board; the question was whether Plaintiff committed acts of 'willful or wanton misconduct' in the practice of chiropractic.

4. For substantial evidence to exist as to whether the Plaintiff committed acts of 'willful or wanton misconduct' in the practice of chiropractic requires the testimony of a qualified expert in that respect. No such evidence was adduced in this case, and the Board's Order based upon a Conclusion of 'willful or wanton misconduct' is therefore unsupported by substantial evidence, contrary to I.C. 4–22–1–14(5).

5. The Board erred in admitting Respondent's Exhibit 2 in its totality, as said Exhibit contained incompetent and inadmissible hearsay. The fact that a party admitted part of said Exhibit into evidence does not give an adverse party the unqualified right to admit the balance of the Exhibit regardless of its nature. In addition to containing hearsay and double hearsay, the hearsay present admitted into evidence by the State contains factual allegations the natural import of which would be to inflame the finder of fact (the Board) and to prejudice the Board against the Plaintiff. Specifically, the hearsay allegation of seventeen (17) other complainants is inflammatory and prejudicial. The admission of such evidence is outside the scope of I.C. 4–22–1–8, and should not have been permitted."

## DECISION

*Trial Court's Findings of Fact and Conclusions of Law*

The Board disputes the trial court's findings of fact Nos. 10, 11, 14, 15, 16, and 17 and its conclusions of law Nos. 1, 2, and 3 and asserts they are contrary to law. Although the Board has rather inartfully pleaded, we perceive our task as being the determination that these findings and conclusions are contrary to the record as presented to the trial court and in contravention of its scope of review. *See Metropolitan Development Commission v. Bicknell*, (1972) 151 Ind.App. 554, 280 N.E.2d 861 ("contrary to law" utilizes same test in judicial review of administrative cases as in other civil cases); *Mills v. Princeton Mining Co.*, (1962) 133 Ind.App. 486, 183 N.E.2d 359. In other words, does the record of the Board's proceeding lead to the conclusion that the Board properly resolved the action whereas the trial court reached the opposite conclusion that it had not?

Initially, we must set forth the standard of judicial review, as we have pronounced it in prior cases, by which the trial court was governed:

"[I]t is improper for a trial court when reviewing agency action to weigh the evidence in the record *de novo* for the purpose of determining for whom it preponderates. If there is any *substantial evidence in the record* to support the judgment of the board it would be error for the trial court to reverse the judgment of the board as being unsupported by the evidence." (Emphasis added.)

*Aeronautics Commission of Indiana v. Radio Indianapolis, Inc.*, (1977) 172 Ind.App. 687, 693, 361 N.E.2d 1221, 1225; *Board of Medical Registration & Examination v. Armington*, (1961) 242 Ind. 436, 178 N.E.2d 741. This court has also stated that "the substantial evidence standard authorizes a

reviewing court to set aside [administrative] findings of fact when a review of the whole record clearly indicates that the agency's decision lacks a reasonably sound basis of evidentiary support." *City of Evansville v. Southern Indiana Gas & Electric Co.,* (1975) 167 Ind.App. 472, 485, 339 N.E.2d 562, 572. With these canons in mind, we review the trial court's findings adjudging the Board's decision deficient.

 The trial court's findings Nos. 10, 14, 15, and 16 attack the sufficiency and substantiality of the evidence to support the Board's findings based on the testimony of the complaining witnesses. In general, the court stated there was no testimony Dr. Ward "massaged" the external genitalia of the women; rather, the testimony revealed Ward only "made contact" with same. In light of the evidence at the hearing, we believe the trial court was incorrect and, to a certain extent, engaged in semantic hairsplitting in denying the Board's findings of "massage."

Brenda testified Ward touched her clitoris with his hand while it was laden with a hand vibrator. In answer to the direct question, "And did he massage your vagina?" she replied, "Yes." The portion of the investigative report read into the record on Ward's behalf indicates he "began massaging [Brenda's] stomach with a vibrator gradually working his hand downward to her vagina where he began to massage around the vagina." Sharon testified to the following: "he had put his four fingers up under the band of the underpants and proceeded to bring his thumb up and run it across my vagina." Ward himself also testified he used a vibrator in her groin area. In part of another investigative report entered into evidence by Ward, Carol was recorded as reporting the following: "Dr. Ward kept massaging around her groin and vagina until it began to hurt." As for the last witness, Rebecca, she testified her treatment consisted of Ward massaging her body with his hand and a hand vibrator. His course took him from both her breasts, down her torso, until his hand, still clad in the vibrator, stopped on her vagina. From the foregoing, it is clear that all but Sharon testified by specifically using the word "massage."

The greatest controversy regarding these particular Board findings concerns the meaning of the word "massage" itself. Ward propounds one meaning which restricts massage to "rubbing or kneading of the body to aid circulation or relax the muscles." However much Ward would prefer us to use this definition, we have found at least two others which expand upon the concept:

> "manipulation of tissues for remedial or hygienic purposes (as by rubbing, stroking, kneading, or tapping) with the hand or other instrument (as a vibrator)."

Webster's Third New International Dictionary 1388 (1976);

> "The act of rubbing, kneading, or stroking the superficial parts of the body with the hand or with an instrument, for therapeutic purposes such as modifying nutrition, restoring power of movement, breaking up adhesions, or improving the circulation."

Blakiston's Gould Medical Dictionary 806 (4th ed. 1979). If we therefore view the term "massage" as a generic term encompassing several types of contact with bodily parts, by hand or instrument, Sharon's testimony can also be characterized as an act of massaging. It applies as well to the incident with Rebecca when Ward's hand, with vibrator, "stopped" on her vagina. We would do a gross injustice to the Board if we were to engage in the linguistic selectivity encouraged by Ward and take a nitpicky legalistic approach to define a word which is primarily referred to in medical terms, e.g. therapy and hygiene. The medical field is the province of the Board, and its regulation is, of course, its *raison d'etre.* The trial court, thus, unjustifiably substituted its own judgment in its findings Nos. 10, 14, 15, and 16 for that of the Board when there was substantial evidence to support the Board's findings Nos. 4, 7, 9, and 11. *See Board of Medical Registration & Examination v. Armington, supra.*

Ward also complains the Board and court's references to "external genitalia" were unfounded, particularly attacking the credibility of witnesses who testified Ward massaged their vaginas. He points out the female vagina is an internal structure and is not amenable to external massage. Again, we believe the Board's role as arbiter in medical matters lends itself better to proper *inferences* regarding anatomy and its terminology than laypersons unversed in terms like "labia," "clitoris," "glans penis," or "scrotum." Therefore, Ward's criticisms of both the Board's and the trial court's findings are not well-taken.

The court's findings Nos. 11 and 17 and conclusions of law Nos. 1 and 3 reflect its judgment there was insufficient evidence to support the Board's ultimate finding of "willful or wanton misconduct." Again, we peruse the record for substantial evidence rather than reweigh conflicting evidence; however, in this particular matter, we must also determine the meaning of the statutory phrase "willful or wanton misconduct" as found in IC 25–22.5–6–2(6).

■ First of all, we must rebut the court's finding No. 11 there was not substantial evidence to support the Board's findings Nos. 5, 8, 10, and 12 that "[n]o justification existed for such chiropractic treatment." The Board's expert, Harp, testified to just such a factual conclusion. Despite Ward's testimony to the contrary, the trial court cannot reweigh the evidence to contradict the substantiality occasioned by Harp's testimony which the Board evidently chose to believe. Hurdling that issue, we progress to the problem inhering in the phrase "willful or wanton misconduct," heretofore undefined by this court in the context of IC 25–22.5–6–2(6).

■ The statute, at the time Ward was charged, read as follows:

"[T]he following charges will be grounds for probation of a licensee or suspension or revocation of a license:

\* \* \* \* \* \*

(6) willful or wanton misconduct or manifest incapacity in the practice of medicine or osteopathic medicine...." [3]

This section was recently defined in 1981 Op.Ind.Att'y Gen. No. 18, p. 66, wherein the phrase "willful or wanton misconduct" was defined for medical licensing purposes in the same terms as we have defined it for our automobile guest statute, Ind.Code 9–3–3–1. The attorney general's opinion particularly quotes from *Becker v. Strater,* (1947) 117 Ind.App. 504, 72 N.E.2d 580:

"Willful or wanton misconduct consists of the conscious and intentional doing of a wrongful act or omission of a duty, with reckless indifference to consequences, under circumstances which show that the doer has knowledge of existing conditions and that injury will probably result." (Emphasis added.)

*Id.* at 506, 72 N.E.2d at 581. We note the attorney general's opinion confined itself to those situations wherein the misconduct "arises entirely from lack of education, training, or skills." We find no need to comment on the correctness of this opinion because we find it inapplicable to Ward's actions. Further, it is a basic tenet of Indiana law that this court is not bound by official opinions of the attorney general. *E.g., Common Council of City of Peru Daily Tribune, Inc.,* (1982) Ind.App., 440 N.E.2d 726; *Illinois-Indiana Cable Television Ass'n, Inc. v. Public Service Commission,* (1981) Ind.App., 427 N.E.2d 1100.

■ Principally, we find the attorney general's definition and all the cases cited by Ward defining language in the automobile guest statute not apropos because the phrase is construed in the context of resultant injury or death. Almost all of Ward's

---

**3.** Our supreme court, under prior law, determined practice of chiropractic is the practice of medicine. *Dean v. State ex rel. Board of Medical Registration & Examination,* (1954) 233 Ind. 25, 116 N.E.2d 503. *Dean* was decided under Burns' § 63–1311 (1961), the precursor to Ind. Code 25–22–1–7 (Burns 1974) (repealed 1975

Ind.Acts, P.L. 271, § 2). IC 25–22–1–7 has since been replaced by Ind.Code 25–22.5–1–1.1 (West 1980) (amended 1981 Ind.Acts, P.L. 222, § 151). IC 25–22.5–1–1.1 is sufficiently similar to the statutory definition of the practice of medicine construed in *Dean* that it continues to subsume the practice of chiropractic.

authorities are mired in tort law. The instant case is a disciplinary action, not a suit to establish liability. Ward's actions are encompassed by a wider spectrum of behavior which may or may not incur injury upon a medical patient—that behavior which is generally associated with professional, ethical. conduct. We have been able to locate only one Indiana case which provides us with definitions of *both* wanton and willful, unfettered by references to tortious behavior. In that case, our supreme court stated,

"The word 'willful' is defined as 'done deliberately: not accidental or without purpose.'

\* \* \* \* \* \*

Webster's New International Dictionary 3rd Ed. defines *wanton* as follows: ' "\* \* \* undisciplined; not susceptible to control; \* \* \*. Excessively merry or gay; sportive; frolicsome; \* \* \* marked by or manifesting arrogant recklessness of justice, or the rights or feelings of others, \* \* \*." ' "

*Clouse v. Peden*, (1962) 243 Ind. 390, 397–98, 186 N.E.2d 1, 4. (Italics in original) These definitions, in conjunction with guidance from cases defining "professional misconduct," convince us to adopt the following revision of our extant definition under the guest statute, realizing in doing so such definition must be a general one as it would be impractical, if not impossible, to specify each and every act or type of conduct which falls within the definition: Willful or wanton misconduct in the practice of medicine consists of the conscious and intentional doing of a wrongful act or omission of a duty, with reckless indifference to the obligations of the medical profession or the consequences to the rights or feelings of others, including the possibility of patient injury, which misconduct renders the practitioner unfit to serve the public as a professional licensee. *See McCartney v. Commission on Judicial Qualifications*, (1974) 12 Cal.3d 512, 116 Cal.Rptr. 260, 526 P.2d 268 (judge: The charge of willful misconduct in office "should be reserved for unjudicial conduct which a judge acting in his judicial capacity commits in bad faith . . . ."); *Cof-*

*fey v. Superior Court of Sacramento County*, (1905) 147 Cal. 525, 82 P. 75 (sheriff charged with willful misconduct: "After defining 'misconduct,' Webster declares it to be synonomous with 'misbehavior,' 'delinquency,' and 'offense.' "); *People v. Harby*, (1942) 51 Cal.App.2d 759, 125 P.2d 874 (city councilman: "Willful misconduct in office includes any willful malfeasance, misfeasance or nonfeasance."); *Richardson v. Florida State Board of Dentistry*, (1976) Fla.App., 326 So.2d 231 (" 'Misconduct' justifying suspension or revocation of a professional license includes acts done in persistent disregard of the law, those which are malum in se . . ., and those which offend generally accepted standards of conduct within the profession, thereby jeopardizing the interests of the profession and the public it serves."); *State ex rel. Griffith v. Howard*, (1927) 123 Kan. 432, 256 P. 172; *State ex rel. State Bar Ass'n v. Finn*, (1898) 32 Or. 519, 52 P. 756. *See also Wirfel v. Unemployment Compensation Board of Review*, (1979) 46 Pa.Commw.Ct. 347, 406 A.2d 1173; *Frick v. Unemployment Compensation Board of Review*, (1977) 31 Pa. Commw.Ct. 198, 375 A.2d 879.

We find support for our position from earlier Indiana case law by which our courts have sustained the revocation of medical licenses where direct physical injury to the patient was not critical. *Board of Medical Registration & Examination v. Armington, supra* (physician addicted to narcotic drugs); *Board of Medical Registration & Examination v. Moore*, (1947) 224 Ind. 621, 70 N.E.2d 354 (violation of Harrison Narcotic Law); *State Board of Medical Registration & Examination v. Scherer*, (1943) 221 Ind. 92, 46 N.E.2d 602 (drugless practitioner's license revoked for posing as M.D. without a license, prescribing drugs, misrepresenting diagnostic powers of a useless machine); *Crum v. State Board of Medical Registration & Examination*, (1941) 219 Ind. 191, 37 N.E.2d 65 (revocation of chiropractor's license for various acts of "gross immorality" including misrepresentation of a weird electrical contraption's curative values, claiming to be able to cure numerous diseases even by broadcasting treatments

long distances, asserting he could lengthen or shorten a patient's legs or cause amputated fingers to grow back, claiming he could treat golf greens as far away as Decatur, Illinois); *see Board of Medical Registration & Examination v. Stidd*, (1978) Ind. App., 177 Ind.App. 21, 377 N.E.2d 896 (case remanded to Board for findings that podiatrist defrauded patient by falsely billing for treatment not performed).

██ Finally, and persuasive, is the case of *Lind v. Medical Licensing Board*, (1981) Ind.App., 427 N.E.2d 671, where this court affirmed the Board's revocation of Dr. Lind's license, in part for willful and wanton misconduct in the practice of medicine, said misconduct consisting in part of acts of violence against non-patients and property of others. Dr. Lind's misdeeds included inducing two of his patients to vandalize other people's homes and a business and to shoot at two other doctors, in return for free medical care, drugs, money, and alcoholic beverages. We therefore find it well within the Board's prerogative not to limit the revocation of licenses to those instances when the treated patient is physically injured or endangered. Neither, according to *Lind*, must the misconduct necessarily involve the treatment of a patient.

██ From the adoption of the foregoing definition, we proceed to address the Board's allegations the court's finding No. 17 and conclusions of law Nos. 1 and 3 are contrary to law. These three paragraphs all challenge the sufficiency of the evidence to support a finding of "willful or wanton misconduct." We agree with the Board that the trial court erred.

██ The Board heard all the testimony, weighed all the evidence, and rendered its decision on the factual issues. It found Ward—without warning, explanation, or

permission—had massaged the genitalia of four of his female patients without any chiropractic justification. These findings were indeed substantial although not uncontradicted. The trial court overstepped the bounds of its judicial review prowess when it overturned a decision of this administrative board, expert in the area of ethical conduct in the practice of medicine. "When the legislature creates a fact finding body of experts, their decision should not be overrid[d]en merely because the reviewing court may have reached a contrary opinion on the same evidence." *Department of Financial Institutions v. Colonial Bank & Trust Co.*, (1978) 176 Ind.App. 368, 375 N.E.2d 285, 288, *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 72 (1979); *Board of Medical Registration & Examination v. Armington, supra*. Determining what behavior constitutes misconduct within the parameters of IC 25–22.5–6–2(6) is a function of the Board which, at Ward's hearing, consisted of four medical doctors, one osteopathic physician, and one chiropractor (with one medical doctor not in attendance). Under the circumstances, we are convinced that it was the Board's function, not the trial court's, to adjudge Ward's conduct in the context of medical professionalism and to make the ultimate finding based on substantial evidence he was guilty of wanton or willful misconduct.[4]

██ The Board disputes one last conclusion of law of the trial court as being contrary to law. That conclusion states the Board's findings of fact are not specific enough as required by case law. We fail to fathom how the trial court reached this conclusion. Each of the Board's findings of fact completely satisfies our requirements:

"It is a simple, straightforward statement of what happened. A statement of what the Board finds has happened; not

4. The trial court in its conclusion of law No. 3, also appears to be somewhat confused by the Board's findings that Ward's treatment of each individual was unjustified. It states Ward's lack of justification was not the issue before the Board. We agree, but we also find the Board made no error. The charge was for "willful or wanton misconduct." The Board's

basic findings indeed reflected the fact the four patients were victims of unjustified chiropractic, but the fact remains the Board still made an *ultimate* finding of "willful or wanton misconduct" based on such underlying facts. *See generally Perez v. United States Steel Corp.*, (1981) Ind., 426 N.E.2d 29.

a statement that a witness, or witnesses, testified thus and so. It is stated in sufficient *relevant* detail to make it mentally graphic, i.e., it enables the reader to picture in his mind's eye what happened. And when the reader is a reviewing court the statement must contain all the specific facts relevant to the contested issue or issues so that the court may determine whether the Board has resolved those issues in conformity with the law." (Emphasis in original).

*Whispering Pines Home for Senior Citizens v. Nicalek,* (1975) Ind.App., 333 N.E.2d 324, 326; *Perez v. United States Steel Corp.,* (1981) Ind., 426 N.E.2d 29. The trial court's conclusion of Law No. 2 and, perforce, its findings of fact No. 19 (also pertaining to specificity of findings but not specifically challenged by the Board) are contrary to law.

*Expert Testimony*

■ The trial court, in its finding of fact No. 12 and conclusion of law No. 4, asserts the Board erred in reaching its decision without expert testimony on whether Ward's conduct constituted willful or wanton misconduct. The trial court is incorrect; no error can be predicated here upon the absence of expert testimony.

■ Ward was charged with, and found guilty of, willful or wanton misconduct in the practice of medicine. This was an ultimate fact in the decision, not a basic fact. *See Perez v. United States Steel Corp., supra.* It is the Board's province to determine findings of ultimate facts, *see generally City of Evansville v. Southern Indiana Gas & Electric Co., supra, Burton-Shields Co. v. Steele,* (1949) 119 Ind.App. 216, 83 N.E.2d 623, although expert testimony on the ultimate fact in issue is not excludable merely because it invades such province; *DeVaney v. State,* (1972) 259 Ind. 483, 288 N.E.2d 732; *Davis v. Schneider,* (1979) Ind.App., 395 N.E.2d 283; *Matter of Adoption of Lockmondy,* (1976) 168 Ind.

App. 563, 343 N.E.2d 793. Such discretionary policy does not, a fortiori, *require* such testimony on the ultimate fact. "Expert testimony may be excluded from evidence when it concerns matters which the [trier-of-fact] may determine as well as the expert or when it concerns matters in which the expert would be determining questions of fact for the [trier-of-fact]." *City of Bloomington v. Holt,* (1977) 172 Ind.App. 650, 661, 361 N.E.2d 1211, 1218; *Emig v. Physicians' Physical Therapy Service, Inc.,* (1982) Ind.App., 432 N.E.2d 52 (in medical malpractice case, admission of expert medical testimony regarding exercise of reasonable care held improper when matters at issue were within common knowledge and experience of jury). Case law further instructs us that deciding whether a party is guilty of willful or wanton misconduct is a function of the trier of fact. *Andis v. Newlin,* (1982) Ind., 442 N.E.2d 1106; *Pierce v. Clemens,* (1943) 113 Ind.App. 65, 46 N.E.2d 836.

■ Our conclusion is not to intimate that expert testimony is never required in hearings of this nature. Where a question of medical diagnosis or treatment is crucial to the Board's ultimate decision, expert testimony is vital. This is particularly true where, as here, not all members of the Board are educated in the same areas of expertise.[5] Further, one must remember that the reviewing court is not a medical expert and must rely on the record, not the "expert" minds of the Board members, to determine the sufficiency of the evidence to uphold the Board's order. *See Hake v. Arkansas State Medical Board,* (1964) 237 Ark. 506, 374 S.W.2d 173; *McKay v. State Board of Medical Examiners,* (1938) 103 Colo. 305, 86 P.2d 232; *Smith v. Department of Registration & Education,* (1952) 412 Ill. 332, 106 N.E.2d 722; *contra, Jaffe v. State Department of Health,* (1949) 135 Conn. 339, 64 A.2d 330. "[The Board] must include any technical matter necessary to enable a lay

---

5. Both the Medical Licensing Board and the new board of chiropractic examiners have one lay member. Ind.Code 25-10-1-1.5, 25-22.5-2 1. Such lay participation appears to be widespread in all regulatory boards. *See, e.g.,* Ind.Code 25-2-1-3 (public accountants); Ind. Code 25-4-1-2 (architects); Ind.Code 25-7-1-20 (barbers); Ind.Code 25-14-1-2 (dentists).

judge to determine whether the agency's decision has adequate support." *Franz v. Board of Medical Quality Assurance,* (1982) 31 Cal.3d 124, 139, 181 Cal.Rptr. 732, 739, 642 P.2d 792, 799. Returning to our situation, Dr. Harp gave his expert testimony that Ward's actions were not recognized chiropractic treatment. Such testimony is necessary to the Board's ultimate decision and the trial court's review. However, contrary to Ward's contentions, this does not mean expert testimony is required on the ultimate decision itself—whether Ward's behavior was willful or wanton misconduct. Here it is *clear,* without the benefit of medical knowledge, that Ward was guilty of misconduct. *See also Lind v. Medical Licensing Board, supra* (criminal activity); *Board of Medical Registration & Examination v. Stidd, supra,* (fraud); *Campbell v. Board of Medical Examiners,* (1974) 16 Or. App. 381, 518 P.2d 1042 (practicing without a license). Under the circumstances, where Ward's conduct was arguably the equivalent of criminal battery [6] and not related to the alleviation of his patients' ills, we conclude the trial court erred when it made *medical* expert testimony mandatory on the

ultimate findings of willful or wanton misconduct.

*Hearsay*

■ The Board next contends the trial court's conclusion No. 5, concerning the admission into evidence of a certain controversial document, was in error. Said document is the report made for the Board by its investigator on Brenda's complaint. Included in that report was information received from another chiropractor who claimed he had the names of 17 women with similar complaints against Ward. The trial court determined this was inadmissible hearsay and highly prejudicial. It appears initially that Ward himself introduced this exhibit although it is unclear how much of the document he wanted the Board to admit. If Ward had indeed wished to limit the report and its use, he did so in such a muddled manner that the Board was induced to admit the whole exhibit.[7] Ward cannot now claim error for such procedure and its result. *See Pokraka v. Lummus Co.,* (1952) 230 Ind. 523, 104 N.E.2d 669 ("parties must abide by a procedure which they have induced a court to follow"); *City of Ham-*

---

6. "A person who knowingly or intentionally touches another person in a rude, insolent, or angry manner commits battery, a class B misdemeanor." Ind.Code 35–42–2–1.

7. The peculiarities in the manner in which the evidence was admitted are as follows: First, we note the document is labelled "Respondent's Ex 2" which, in the Board hearing setting, implies Ward was its proponent. Further, the record reveals a series of very confusing, internecine exchanges between Ward's counsel and the attorney general concerning legal principles, the net result of which would necessarily only serve to baffle the "lay" Board. What we have been able to glean however is the following passage of events:
1. Ward called the Board's investigator for his defense case-in-chief and presented the document to him for identification purposes.
2. Ward requested he read the document into the record whereupon the attorney general strenuously objected. Ward insisted he was not offering the document as an exhibit.
3. The Board President requested he offer it into evidence which Ward declined to do.
4. Ward then was able to get the investigator to read those portions of the report pertaining to Brenda's complaint.

5. On cross-examination, the attorney general attempted to have the investigator read the remainder of the report into the record, but Ward objected. The Board President ruled the oral testimony would be admitted.
6. Ward then requested the whole document be admitted:
"In that case, could we suggest, over our objection, of course, that the document merely be admitted—it's already marked Respondent's Exhibit 2—if the Board is going to admit the whole thing. We're not agreeing to the admission, but we suggest that it merely be admitted. (Record, p. 240)

\* \* \* \* \* \*

"I did have it marked as Respondent's Exhibit 2, and I suggested to the Board that it be admitted over my objection...." (Record, p. 243.)
It is not entirely clear if the exhibit itself, or only its oral reading, was admitted, but even so, Ward was a contributing factor to any error in its admission. We fail to understand by what legalistic legerdemain Ward hoped to have the whole document admitted as his exhibit and to object to it at the same time. Understandably confused by these tactics, the Board did as Ward requested.

*mond v. N.I.D. Corp.,* (1982) Ind.App., 435 N.E.2d 42.

We also have found no indication the Board was influenced by the material in reaching its decision. No part of the findings is based on the allegedly prejudicial material, and thus any error in its admission is harmless. See *Winfrey v. State Life Insurance Co.,* (1949) 227 Ind. 449, 85 N.E.2d 821; *D.H. v. J.H.,* (1981) Ind.App., 418 N.E.2d 286. Further, at the time of the admission of the questioned exhibit, the Board's President cautioned:

> "I don't see how we can admit one testimony and not the other, *but I'll say that the Board is not to place any credibility in the hearsay evidence,* and it will be admitted into evidence." (Emphasis added.)

Record, p. 240. Finally, we must also recognize the admission was harmless because Ward *admitted* some of the charged contact with the female patients but maintained it was *legitimate treatment.* It is a logical inference that he would have utilized what he considered to be legitimate treatment upon his other female patients, a fact implied in the investigator's report.[8] By reason of the foregoing, the trial court erred by finding reversible error in the admission of this exhibit.

*Board's Jurisdiction to Issue Its Findings*

As an alternate ground for reversal of the Board's decision, Ward points out he received notice of the Board's decision on October 18, 1980, he filed his petition for

judicial review on October 20, 1980, and he received the Board's findings and order on October 23, 1980. He claims that the law requires the Board to make findings of fact as a basis of its order of revocation, but those findings were not in existence on October 18, 1980. Further, he claims the Board's jurisdiction ended when he filed his petition with the trial court. Thus, he concludes that the Board's findings, entered after the court proceeding was initiated, were made in excess of the Board's jurisdiction and are a nullity. In support of his conclusion, he cites the trial court's finding of fact No. 7, which states:

> "The written Findings of Fact, Conclusions of Law and Order were not reduced to writing until after October 20, 1980. However, the Court finds that they were properly before this Court, and that the Court has jurisdiction of this cause."

Our examination of the record reveals the following: On October 16, the Board met and reached the decision to revoke Ward's license. As a result, a letter was prepared on October 17. Said letter was signed by Dr. I.J. Kwitny, M.D., Medical Director, sent by certified mail, and read as follows:

"Dear Dr. Ward:

The Medical Licensing Board met on the 16th of October, 1980, and after due deliberation following your hearing on September 18, 1980, arrived at the decision that your license be revoked. The revocation of your license is effective immediately."

---

8. Examples of Ward's admission and acknowledgement of similar treatment of other patients and his protestations of legitimacy are the following:

> "Q. [Defense Counsel] Did you at any time during [Brenda's] visit to your office make any sort of sexual advance toward [Brenda]?
> A. [Ward] I did not.
> Q. Well, did you hear her testimony about—
> A. I did.
> Q. —massaging her abdomen and genital areas?
> A. Yes, sir.
> Q. Is that true? Is what she said true?
> A. To a point.
> * * * * * *
> Q. To what point is her testimony true? That was my question to you.

> A. Her testimony was true to the point that I did use the vibrator, yes, in the region of the vagina, but it was not sexually motivated in any way. It was for relaxation of the hip and leg.
> * * * * * *
> Q. She indicated that you actually touched her sexual organs. Is that true?
> A. It could be, yes."
> Record, pp. 293–94
> "Q. Did you hear [Sharon's] testimony about the vibrator and all that?
> A. I did, yes, sir.
> * * * * * *
> Q. Did you use it in the area of the breasts?
> A. I may have, yes. *I do on a lot of people.* There are pressure points in the chest area."
> Record, pp. 299–300. (Emphasis added.)

At that time, the Board had apparently not reduced its findings of fact and order into writing. However, this task was accomplished within a few days inasmuch as Ward received the Board's decision on October 23 via certified mail.

The language of our Administrative Adjudication Act applicable to notice of an agency's action which triggers the procedure for judicial review is found in two sections of the Act. The first is Section 14 which reads:

"Said petition for review shall be filed within fifteen (15) days after receipt of notice that such order, decision or determination is made by any agency. *Notice shall be given in the manner prescribed by section 6 of this act.* [Ind.Code 4–22–1–6] Unless a proceeding for review is commenced by so filing such petition within fifteen (15) days any and all rights of judicial review and all rights of recourse to the courts shall terminate."

Ind.Code 4–22–1–14. (Emphasis added.) The second is Section 6, concerning the manner of notice as required in Section 14, which reads in pertinent part:

"In all cases in which the agency is the moving party it shall give at least five (5) days' notice in writing by registered or certified mail with return receipt requested, addressed to the person or persons against whom an order or determination may be made at their last known place of residence, or place of business, which notice shall set forth therein a sufficient statement of the matters of fact or law to advise such person of the matters in issue . . . ."

IC 4–22–1–6. We believe it clear that Section 14, read together with Section 6, merely requires notice of an agency's decision be in writing and delivered by registered or certified mail to the respondent involved. The provision was obviously not intended to require the agency to give the respondent five days' notice of its impending decision. In the record here, documents filed by the attorney general suggest the earlier notice to Ward of the forthcoming decision was sent as a courtesy to notify Ward of the

Board's action before releasing the information to the general public. Whatever the reason, sending the first letter was technically incorrect. It cannot be denied it was not merely a notice of an impending order since it cautioned that its decision was effective immediately.

After reviewing the record and the appropriate law, we arrive at the same conclusion as the trial court in its finding of fact No. 7—that the Board's findings, conclusions and order were properly before the trial court. In *Department of Financial Institutions v. State Bank of Lizton*, (1969) 253 Ind. 172, 252 N.E.2d 248, our supreme court reviewed a claim that the Department of Financial Institutions failed to make a finding of fact to support the denial of a request to open a branch bank. After acknowledging the necessity of such a finding to support the Department's decision, the court concluded its opinion as follows:

"The failure of the Department of Financial Institutions to make a special finding to support its decision in this case does not necessarily invalidate its order or proceedings. It is a technical defect in the procedure which, in our opinion, the Department should have an opportunity to remedy.

The judgment of the trial court is therefore reversed, with directions that it remand the case to the Department of Financial Institutions, with directions to make a special finding of fact and for further proceedings thereafter not inconsistent with this opinion."

*Id.* at 179, 252 N.E.2d at 252.

Additionally, we note the language of another section of the Administrative Adjudication Act permits an agency to modify its order during the period afforded for judicial review with provision the modification will be subject to judicial review. This section states:

"In addition to any other power existing by statute or law to modify its order or determination every agency shall have authority to modify any order or determination during the time within which a judicial re-review could be had thereof.

Any person aggrieved by any such modification may have a judicial review thereof as provided for reviews of agency determination."

Ind.Code 4–22–1–26.

Here, despite the untimely procedure utilized by the Board, its findings of fact, conclusions of law and order were presented to the trial court for review. Ward was permitted to amend his petition and given full opportunity to attack the Board's order. Thus, any possible technical error was rendered harmless. Because the issues were fully litigated, it would be a useless act to remand to the Board for readoption of its findings, conclusions, and order. The remand in *Department of Financial Institutions v. State Bank of Lizton, supra,* was necessitated only because of the nonexistence of an appropriate finding.

We conclude that the technical error by the Board in sending its notice of revocation before findings were adopted was cured by their proper adoption shortly thereafter so as to permit Ward the opportunity to object thereto in appropriate court proceedings.

*Due Process*

▮ Ward presents another alternate ground for reversal in the Board's failure to accord him his right to procedural due process. This challenge is premised on an alleged variance between the Board's charge against him and the Board's findings. Ward argues there is a fatal difference between the charge that he massaged four female patients' vaginas (which are internal) and findings of fact that he actually massaged their "genitalia," a term which includes internal and external sexual organs. Certainly it is undisputed that the charge against a practitioner is sufficient only where he is informed "of the nature of the wrong charged, and of the particular instances of its perpetration so that he may prepare his defense," 70 C.J.S. *Physicians & Surgeons* § 18 (1951), and the order revoking a license should not be based on grounds

other than those specified in the charges. *See, e.g., Rodale Press, Inc. v. Federal Trade Commission,* (D.C.Cir.1968) 407 F.2d 1252; *Northeastern Indiana Building & Construction Trades Council v. NLRB,* (D.C. Cir.1965) 352 F.2d 696; *City of Anderson v. State ex rel. Page,* (1979) Ind.App., 397 N.E.2d 615 (police officer had no notice of charge of mental incapacity); *State ex rel. Kassabian v. State Board of Medical Examiners,* (1951) 68 Nev. 455, 235 P.2d 327. Variance here between the charge and the findings, if any, must be deemed miniscule and of no legal significance. The word "genitalia" encompasses the vagina, the definition of "genitalia" being "[t]he organs of generation, comprising . . . in the female the vulva, the vagina, the ovaries, the uterine tubes, and the uterus." Blakiston's Gould Medical Dictionary 553. Ward cannot logically claim that this record discloses he was misled or prejudiced in any way by any alleged variance.[9] Indeed, his defense was predicated in part on the medical propriety of his conduct. We conclude his alleged error in this regard is specious at best.

*Void for Vagueness*

▮ Ward's next argument focuses on the statutory phrase "willful or wanton misconduct" and asserts it is unconstitutionally void for vagueness. He contends this issue not only requires affirmance of the trial court but also the elimination of any remand.

The pertinent statute, IC 25–22.5–6–2(6), has already successfully withstood an attack on vagueness grounds. *Lind v. Medical Licensing Board, supra.* This is sufficient authority to rebut Ward's assertion that the phrase "willful or wanton misconduct," included in IC 25–22.5–6–2(6), is also not void for vagueness. Regardless, we find the phrase sufficiently descriptive of unacceptable behavior in the practice of medicine to give Ward warning he ran the risk of discipline for his actions.

---

**9.** Ward was also charged with massaging the breasts of one patient. Evidence substantiated the charge, and Dr. Harp testified such treatment had no chiropractic basis. Obviously,

Ward makes no argument that a variance existed between the charge and the findings in this regard.

The statute in controversy specifically addressed unacceptable conduct in the practice of medicine, further limited by the words "wanton" and "willful." Thus, it does not suffer from the defect perceived in *Soglin v. Kauffman,* (7th Cir.1969) 418 F.2d 163, where the use of the lone term "misconduct" as a standard for university discipline was found vague because it "afford[ed] no safeguard against the imposition of disciplinary proceedings overreaching permissible limits and penalizing activities which are free from any taint of impropriety." *Id.* at 168. In addition, the review of behavior such as in the case here is conducted by the Board which is best qualified to determine the ethics of the medical profession. *See Board of Medical Examiners v. Mintz,* (1963) 233 Or. 441, 378 P.2d 945. In the *Mintz* case, the term, "unprofessional conduct" was attacked as vague. We are persuaded by the language of the Oregon court when it stated,

> "Admittedly, the term 'unprofessional conduct' does not have precise contours circumscribing its meaning. The limits between good and bad professional conduct can never be marked off by a definite line of cleavage. And the variety of forms which unprofessional conduct may take makes it infeasible to attempt to specify in a statute or regulation all of the acts which come within the meaning of the term. The fact that it is impossible to catalogue all of the types of professional misconduct is the very reason for setting up the statutory standard in broad terms and delegating to the board the function of evaluating the conduct in each case."

*Id.* at 448, 378 P.2d at 948; *Martinez v. Texas State Board of Medical Examiners,* (1972) Tex.Civ.App., 476 S.W.2d 400. We

thus find the phrase "willful or wanton misconduct" as proscribed in IC 25–22.5–6–2(6) and as adjudged by a panel of qualified experts not void for vagueness.[10] And, as in Ward's particular case, it is not unusual to find discipline imposed for improper conduct toward female patients. *Cardamon v. State Board of Optometric Examiners,* (1968) 165 Colo. 520, 441 P.2d 25; *Ross v. State, Division of Professions, Department of Professional & Occupational Regulations, Florida State Board of Chiropractic Examiners,* (1977) Fla.Dist.Ct.App., 342 So.2d 1023; Annot., 15 A.L.R.3d 1179 (1967). Because such conduct is so clearly recognized as existing beyond the pale of acceptable professional behavior, we are also aided in our decision by our opinion in *Atkinson v. City of Marion,* (1980) Ind.App., 411 N.E.2d 622. We declared there, in the case of a policeman dismissed for "conduct unbecoming an officer":

> "[W]e ... believe it is not inconsistent with those principles of statutory analysis to conclude, in cases such as the one at bar, that a [professional] whose conduct is *clearly* within the contemplation of a disciplinary statute or rule should not be entitled to escape responsibility for his actions merely because the same provision may be imprecise when applied in different contexts."

*Id.* at 627.

In *Crum v. State Board of Medical Registration & Examination, supra,* our supreme court also stated:

> "It is enough to say that this court will not judicially presume that the General Assembly intended to authorize a course of conduct so reprehensible and revolting as to shock the sensibilities of reasonable men; on the contrary, it must be assumed that in providing for these licenses, the

10. We also find this statute distinguishable from the offensive language discussed in *Cassidy v. Indiana State Board of Registration & Examination in Optometry,* (1963) 244 Ind. 137, 191 N.E.2d 492. In the *Cassidy* case, our supreme court found unconstitutional, as an abrogation of legislative authority, the following addendum on an enumerated list of "unprofessional conduct": "any other acts that said [optometry] board may find to be unprofessional conduct, shall be deemed by said board as unprofessional conduct." Burns § 63–1018(a) (1961). The supreme court explained this language must be construed against the denial of freedom and that unprofessional conduct must either be explicitly defined or should clearly fall within the scope of the particular act. We perceive IC 25–22.5–6–2(6) as clearly falling within the medical licensing act and as defining a specific kind of "unprofessional" conduct.

Legislature intended that the methods employed thereunder should bear some rational relationship to the alleviation of human ills."

219 Ind. at 195, 37 N.E.2d at 67. Ward's void for vagueness argument must thereby fail.

### Partiality of the Board

Ward presents us with two additional issues which he declares require that we affirm the trial court's decision and also that we dispose of the case without further remand. We dispense with these issues with very little effort.

█ Ward argues he was denied due process because the Board was not fair and impartial. He claims medical doctors are not proper parties to sit in judgment upon chiropractors because of professional antagonisms. Our supreme court has addressed this issue in *Lucas v. State ex rel. Board of Medical Registration & Examination*, (1951) 229 Ind. 633, 99 N.E.2d 419, *cert. denied* (1952) 342 U.S. 919, 72 S.Ct. 366, 96 L.Ed. 687, and concluded that in the absence of a direct pecuniary interest in the elimination of a chiropractor from the practice of medicine, the Board is not disqualified to sit as solons over chiropractors. *See also Board of Medical Registration & Examination v. Stidd, supra.* Ward's brief fails to cite us to any part of the record indicating the Board members are from Ward's community or are financially interested in such community or in his practice. In the absence of such evidence, Ward cannot show the requisite pecuniary interest to disqualify the Board as his tribunal. *Id.*[11]

█ Ward also argues that the Board is trying to unlawfully restrict the practice of chiropractic further than statutorily required. Other than this bald assertion, his brief fails to favor us with pertinent case law, evidence from the record in support thereof, or any argument whatsoever. This issue is waived. Ind. Rules of Procedure, Appellate Rule 8.3(A)(7).

### Mootness

█ Ward argues the Board's appeal here should be dismissed as moot. The Board's authority over chiropractors ended July 1, 1982, when the newly instituted board of chiropractic examiners became effective, in accordance with 1981 Ind.Acts, P.L. 222. His chief contention is that in the absence of an express savings clause in 1981 Ind.Acts, P.L. 222, actions brought under the auspices of the Medical Licensing Board were extinguished on July 1, 1982, with the formation of another board to regulate chiropractors. We agree with Ward there appears to be no savings clause in the 1981 act which parallels that found in 1975 Ind.Acts, P.L. 271, expressly saving the powers and actions of the board of medical registration and examination by *transferring* them to the newly created medical licensing board. However, an express savings clause is not required to preserve rights and forfeitures under repealed statutes. *State ex rel. Milligan v. Ritter's Estate*, (1943) 221 Ind. 456, 48 N.E.2d 993. The foundation for this principle is found in Ind.Code 1–1–5–1, which states:

"Whenever an act is repealed which repealed a former act, such act shall not thereby be revived, unless it shall be so expressly provided. And the repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture or liability incurred under such statute, unless the repealing act shall so expressly provide; and such statute shall be treated as still remaining in force for the

11. It was contended in *Lucas* that the Board was comprised of five medical doctors and was therefore not an impartial tribunal. In response, the court rejected this contention and stated that

"[m]erely because a person holds a license in a certain professional field, and is appointed to a board to pass upon the qualifications of those requesting a license to operate in that field, it cannot be said to justify the assertion that he is so unfair and partial that he cannot fairly and impartially pass upon the requirements and fix the standards as set by the Legislature. If this were true, the composition of every professional board in the State of Indiana, including the Board of Law Examiners, would offend the Constitution." 229 Ind. at 646–47, 99 N.E.2d at 425.

purposes of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability."

*See also State ex rel. Milligan v. Ritter's Estate, supra.*

██ Thus, when the statutes regulating chiropractors, Ind.Code 25–10–1–1 *et seq.,* were amended by the 1981 act to create a new regulatory board, all authority of the Board over chiropractors was impliedly repealed. But this particular action, by grace of IC 1–1–5–1, is still effective over Ward for his conduct prior to July 1, 1982. This appeal is therefore not moot.[12]

By reason of the above and foregoing, we reverse the trial court, reinstate the decision of the Board revoking Ward's license, and lift the stay order imposed by the court.

BUCHANAN, C.J. (sitting by designation), and CONOVER, J., concurs.

---

**12.** It appears to us Ward would prefer to have his case heard by a board composed entirely of chiropractors, perhaps with the hope he will be treated more charitably. This hope, however, seems chimerical when one considers the actions of the three chiropractors involved in the case: one testified against him, one agreed to help the Board investigate allegations to locate complainants, and the third (the Board member) voted against him.

In addition, we need not decide whether this action would have actually been remanded to the new board as the agency now taking over the regulation of chiropractic. Ward did not argue that issue, and our reversal of the trial court would have rendered it moot.